MAINE SUPREME JUDICIAL COURT                                  Reporter of Decisions
Decision:     2014 ME 158
Docket:       Ken-13-545
Argued:       September 9, 2014
Decided:      December 31, 2014

Panel:        SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, JABAR, and HJELM,
              JJ.
Majority:     SAUFLEY, C.J., and MEAD, GORMAN, and HJELM, JJ.
Dissent:      ALEXANDER, SILVER, and JABAR, JJ.

## JAMES M. DICKAU

v.

## VERMONT MUTUAL INSURANCE CO.

GORMAN, J.

[¶1]   James M. Dickau appeals from a summary judgment entered on stipulated facts by the Superior Court (Kennebec County, *Nivison, J.*) in favor of Vermont Mutual Insurance Company on Dickau's complaint seeking uninsured motorist coverage. Dickau contends that, contrary to the Superior Court's decision, he is entitled to uninsured motorist coverage on his umbrella policy with Vermont Mutual pursuant to the policy language or, in the alternative, by operation of law. We affirm the judgment.

## I.  BACKGROUND

[¶2]   The parties stipulated to the following material facts. In June of 2011, Dickau was riding his motorcycle in Maine when he was struck by a vehicle driven

by Irida L. Macomber. The accident was caused by Macomber. Dickau suffered more than $250,000 in damages. At the time of the accident, Dickau was covered by two insurance policies: (1) a Dairyland Insurance Company policy insuring his motorcycle and providing $250,000 in uninsured motorist coverage, and (2) a Vermont Mutual personal umbrella policy providing liability coverage above any qualifying minimum primary insurance for up to $1 million per occurrence. Macomber had $100,000 in liability insurance coverage through Travelers Commercial Insurance Company. Dickau settled his claim against Macomber for her Travelers policy limit of $100,000. Dickau also settled his claim for uninsured motorist benefits with Dairyland for $150,000 (Dairyland's $250,000 uninsured motorist coverage maximum minus the $100,000 from Travelers).

[¶3] In May of 2012, Dickau commenced the present litigation seeking a declaratory judgment that his umbrella policy with Vermont Mutual provides for uninsured motorist coverage (Count I), and that, even if the policy does not, Vermont Mutual was nevertheless required to provide up to $1 million in uninsured motorist coverage pursuant to statute (Count II), as offset by the Travelers and Dairyland settlements.[1] The parties stipulated to the facts, and each moved for summary judgment.

---

[1] Vermont Mutual is a Vermont company doing business in Maine. Dickau is a resident of Maine and the accident occurred in Maine. Notwithstanding Dickau's references to Vermont law, we apply only Maine law to the present action. *See Flaherty v. Allstate Ins. Co.*, 2003 ME 72, ¶¶ 16-21, 822 A.2d 1159.

[¶4]   By decision dated November 12, 2013, the court granted Vermont Mutual's motion for summary judgment and denied Dickau's.  Dickau appeals.

## II.  DISCUSSION

[¶5]  Uninsured motorist (UM) coverage is a type of insurance that allows an injured person to recover, from his own insurer, damages caused by a party who is uninsured or underinsured.[2]   24-A M.R.S. § 2902 (2014).   In this way, UM coverage represents an exception to the basic premise underlying insurance law, and tort law in general, that an injured person's damages are paid by or on behalf of the at-fault party.  *Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 34, 989 A.2d 733; 9 Steven Plitt et al., *Couch on Insurance 3d* § 122:2 (2008 Rev. ed.); 1 Alan I. Widiss & Jeffrey E. Thomas, *Uninsured and Underinsured Motorist Insurance* [hereinafter *UM Insurance*] § 1.1 (3d ed. 2005).

[¶6]   The vast majority of states have opted to make UM coverage mandatory. Maine first did so in 1967, P.L. 1967, ch. 93, § 1 (effective Jan. 1, 1968), and is now among the forty-eight states[3] that require insurers to provide uninsured motorist coverage in certain circumstances:

---

2  "Uninsured" coverage is deemed to include "underinsured" coverage, i.e., coverage of less than the statutory minimum for bodily injury liability insurance or "less than the limits of the injured party's uninsured vehicle coverage," depending on the type of policy.  24-A M.R.S. § 2902(1) (2014); *see Levine v. State Farm Mut. Auto. Ins. Co.*, 2004 ME 33, ¶ 8, 843 A.2d 24.

3   Only Michigan and Ohio do not require UM coverage by statute.  *See 6 New Appleman on Insurance Law* § 65.01[1][a] n.11 (Christopher J. Rubinette ed. 2011).

4

> A policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle may not be delivered or issued for delivery in this State with respect to any such vehicle registered or principally garaged in this State, unless coverage is provided in the policy or supplemental to the policy for the protection of persons insured under the policy who are legally entitled to recover damages from owners or operators of uninsured, underinsured or hit-and-run motor vehicles, for bodily injury, sickness or disease, including death, sustained by an insured person resulting from the ownership, maintenance or use of such uninsured, underinsured or hit-and-run motor vehicle.

24-A M.R.S. § 2902(1).

[¶7]   Pursuant to 24-A M.R.S. § 2902(2), the amount of UM coverage a policy must provide to an owner or operator of a vehicle registered in Maine depends on the applicability of the Maine Automobile Insurance Cancellation Control Act (the MAICCA), 24-A M.R.S. §§ 2911-2924 (2014).   For policies subject to the MAICCA or to certain assigned risk plans,

> the amount of coverage to be so provided may not be less than the amount of coverage for liability for bodily injury or death in the policy offered or sold to a purchaser unless the purchaser expressly rejects such an amount, but in any event may not be less than the minimum limits for bodily injury liability insurance provided for under Title 29-A, section 1605, subsection 1 [i.e., $50,000 per person or $100,000 per accident].

24-A M.R.S. § 2902(2); *see* 29-A M.R.S. § 1605(1) (2014).   Thus, although an insured may elect to reject UM coverage equal to the full amount of coverage provided for bodily injury by his or her automobile liability policy in favor of only the statutory minimums, the insured may only do so by signing a form provided by

the insurer that contains specific language to that effect.  24-A M.R.S. § 2902(2).

For policies not subject to the MAICCA, UM coverage is required only according

to the statutory minimums: "[T]he amount of coverage so provided may not be less

than the minimum limits for bodily injury liability insurance provided for under

Title 29-A, section 1605, subsection 1."  24-A M.R.S. § 2902(2); *see* 24-A M.R.S.

§ 2913 (2014).

[¶8]   Given this statutory mandate, most insurers expressly include the

required UM coverage in their policies and then account for that coverage in the

premiums charged.  9 Steven Plitt et al., *Couch on Insurance* § 122:2; 1 Widiss &

Thomas, *UM Insurance* § 2.7.   When the policy is silent as to UM coverage, or

when the premiums the insurer charges do not appear to account for any UM

coverage, UM coverage is nevertheless deemed to be a part of the policy according

to section 2902, absent the insured's express waiver.  *See* 1 Widiss & Thomas, *UM*

*Insurance* § 2.7.

[¶9]   Dickau's appeal requires us to examine the scope of the policies to

which the UM statute applies and, for the first time, to consider whether the UM

statute's requirements apply to umbrella policies.

[¶10]  An umbrella policy is one of two forms of excess insurance coverage,

the other being so-called "true excess" policies.  4 Rowland H. Long, *The Law of*

*Liability Insurance* § 22.03 (2005).  A true excess policy "provides coverage above

6

a single primary policy for specific risks," and "is purchased by the insured to protect against large losses or an accumulation of small losses." *Id*. In short, a true excess policy effectively extends the policy limit for an underlying primary policy covering precisely the same losses.

[¶11] An umbrella policy, in contrast, "provides coverage over more than one primary policy," such as homeowners' insurance, automobile insurance, boat insurance, aircraft insurance, general liability insurance, and the like.[4] *Id*. As with true excess policies, umbrella policies are "parasitic" in that they require that the insured maintain and exhaust an underlying primary policy. *Peerless Indem. Ins. Co. v. Frost*, 723 F.3d 12, 18 (1st Cir. 2013); *see* 15 Lee R. Russ & Thomas F. Segalia, *Couch on Insurance 3d* § 220:32 (2005 & Supp. 2009). The secondary nature of umbrella coverage, covering only catastrophic losses, is reflected in its premiums, which are ordinarily quite low. *Globe Indem. Co. v. Jordan*, 634 A.2d 1279, 1284 (Me. 1993); *Apodaca v. Allstate Ins. Co.*, 255 P.3d 1099, 1103 (Colo. 2011); *Trinity Universal Ins. Co. v. Metzger*, 360 So. 2d 960, 962 (Ala. 1978).

---

[4] There is also more than one type of umbrella policy. For example, parties may contract for other forms of umbrella policies that cover high-risk events that the underlying primary policy will not, and are therefore sometimes referred to as gap coverage. 15 Lee R. Russ & Thomas F. Segalia, *Couch on Insurance 3d* § 220:32 (2005 & Supp. 2009); 4 Rowland H. Long, *The Law of Liability Insurance* § 22.03 (2005); 1 *New Appleman on Insurance Law* § 1.06[7] (Francis J. Mootz III ed. 2011). Dickau's policy does not provide such gap coverage, and we have not considered the applicability of the UM statute to umbrella policies that do.

[¶12]  Because parties are free to contract as they please, an umbrella policy *could* include UM coverage.  *See, e.g.*, *Apodaca*, 255 P.3d at 1107 ("To date, the General Assembly has left this option to the marketplace.").  Thus, Dickau first argues that his policy with Vermont Mutual includes UM coverage up to his $1 million policy limit.  Dickau argues in the alternative that, if the policy does not include such coverage, UM coverage is deemed included in his umbrella policy by operation of section 2902, again up to his $1 million policy limit.  We therefore analyze whether Dickau's Vermont Mutual policy provides UM coverage either pursuant to its terms or by operation of statute.

A.    Policy Language

[¶13]  We interpret an insurance policy de novo.  If the language of the policy is unambiguous, we apply its plain meaning.  *Langevin v. Allstate Ins. Co.*, 2013 ME 55, ¶ 9, 66 A.3d 585.  If the language of the policy is ambiguous, we construe it against the insurer and liberally in favor of the insured, *id.*, but in that case, "summary judgment may not be granted because an unresolved factual issue, *i.e.*, the intent of the parties, remains for the trier of fact," *Me. Mut. Fire Ins. Co. v. Grant*, 674 A.2d 503, 505 (Me. 1996) (quotation marks omitted).

[¶14]  Dickau's policy with Vermont Mutual states that it is a "Personal Umbrella Liability Policy" with a $1 million limit.  On the introductory page, it states: "Remember, this is a liability policy.  It covers your legal liability for claims

made against you by someone else. It does not cover damages to your own property, your car, your house, or your valuables." The umbrella policy requires that Dickau maintain certain "MINIMUM PRIMARY INSURANCE REQUIREMENTS" with regard to automobiles, homes, rental properties, residential employees, watercraft, and recreational vehicles, and states that it "does not provide coverage below [those] limits of liability." In particular, it requires Dickau to carry "Auto Liability Insurance (Including Uninsured/Underinsured Motorists Coverage Where Required by Law)" of at least $250,000 per person and $500,000 per accident for bodily injury.

[¶15] The policy states as to its "[c]overage" as follows: "We pay damages on behalf of the **insured**, subject to the Exclusions and Limits of Liability." "[D]amages" is further defined with reference to the "sums the **insured** must pay." It also specifically excludes from coverage any "**Personal injury** to [the insured] or a relative who is a resident of [the insured's] household" and "[a]ny claim for Uninsured/Underinsured Motorists Coverage(s) as defined in any **primary policy** described in the Declarations."

[¶16] Dickau points to the declarations page of the policy—on which "Each Claim for Uninsured/Underinsured Motorists Property Damage Coverage where such coverage must be provided by law" is labeled "Not Covered"—to argue that by excluding only UM property damage coverage, Vermont Mutual has implicitly

agreed to cover UM personal injury damages. He also contends that the requirement that he maintain UM coverage as part of a primary policy means that the umbrella policy provides UM coverage as well.

[¶17] We disagree. As the Superior Court concluded, under no reasonable interpretation could a policy with a specific exclusion for the insured's personal injury be read to provide UM coverage for the insured's personal injury. The unambiguous language of the policy as a whole does not support Dickau's contention that it provides UM coverage.

B.     UM Coverage by Operation of Law

[¶18] Although Dickau's umbrella policy with Vermont Mutual itself unambiguously provides no UM coverage, we next conduct a de novo interpretation of Maine's UM statute to determine if, despite the language of the policy, the statute requires Vermont Mutual to provide UM coverage in the umbrella policy. *See Butterfield v. Norfolk & Dedham Mut. Fire Ins. Co.*, 2004 ME 124, ¶ 4, 860 A.2d 861, *superseded by statute*, P.L. 2005, ch. 591, § 1 (effective Aug. 23, 2006).

[¶19] In interpreting a statute, our single goal is to give effect to the Legislature's intent in enacting the statute. *Berube v. Rust Eng'g*, 668 A.2d 875, 877 (Me. 1995). Among the many sources we may consult to determine that

legislative intent, we first determine if the language of the statute—here, section 2902—is plain and unambiguous. *Butterfield*, 2004 ME 124, ¶ 4, 860 A.2d 861.

[¶20] A plain language interpretation should not be confused with a literal interpretation, however. *See Doe v. Reg'l Sch. Unit 26*, 2014 ME 11, ¶ 15, 86 A.3d 600 ("A court can even ignore the literal meaning of phrases if that meaning thwarts the clear legislative objective." (quotation marks omitted)); *Town of Embden v. Madison Water Dist.*, 1998 ME 154, ¶ 7, 713 A.2d 328 (stating that "[r]easoning and judgment, not the mere bald literalness of statutory phrasing, must guide and control" (quotation marks omitted)); *Me. Beer & Wine Wholesalers Ass'n v. State*, 619 A.2d 94, 97 (Me. 1993) ("If necessary, we may ignore the literal meaning of phrases in favor of an interpretation consistent with the legislative intent."); *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983) ("It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute . . . ."); *United States v. Falvey*, 676 F.2d 871, 875 (1st Cir. 1982) ("[C]ourts are not bound to read a statute literally . . . ."). Rather, courts are guided by a host of principles intended to assist in determining the meaning and intent of a provision even within the confines of a plain language analysis. *See, e.g., State v. Papazoni*, 622 A.2d 501, 503 n.1 (Vt. 1993) ("[L]ike

all other rules of statutory construction, [the plain language rule] is no more than an aid in our efforts to determine legislative intent.").

[¶21]  Among these is the principle that we must interpret the plain language by taking into account the subject matter and purposes of the statute, and the consequences of a particular interpretation.  *Merrill v. Me. Pub. Emps. Ret. Sys.*, 2014 ME 100, ¶ 15, 98 A.3d 211.  In determining a statute's "practical operation and potential consequences," we may reject any construction that is "inimical to the public interest" or creates absurd, illogical, unreasonable, inconsistent, or anomalous results if an alternative interpretation avoids such results.  *Doe*, 2014 ME 11, ¶ 15, 86 A.3d 600 (quotation marks omitted).  We also may read exclusions into a statute when to do otherwise would render the statute "entirely at odds with its history and apparent intent."  *Falvey*, 676 F.2d at 875.

[¶22]  In applying these principles, we examine the entirety of the statute, "giving due weight to design, structure, and purpose as well as to aggregate language."  *In re Hart*, 328 F.3d 45, 48 (1st Cir. 2003) (quotation marks omitted).  We reject interpretations that render some language mere surplusage.  *Cent. Me. Power Co. v. Devereux Marine, Inc.*, 2013 ME 37, ¶ 8, 68 A.3d 1262.  In the absence of legislative definitions, we afford terms their "plain, common, and ordinary meaning, such as people of common intelligence would usually ascribe to them," *Levine v. State Farm Mut. Auto. Ins. Co.*, 2004 ME 33, ¶ 19, 843 A.2d 24

(alteration omitted) (quotation marks omitted); *see* 1 M.R.S. § 72(3) (2014), but we must also honor the idiosyncratic meanings and connotations of terms of art, particularly in specialized areas of law such as insurance, *see Dubois v. Madison Paper Co.*, 2002 ME 1, ¶ 13, 795 A.2d 696 ("We assume the Legislature intended the well-established meaning of a well-known term.").

[¶23]  In short, in interpreting the plain language of the statute, we must take pains to avoid an overly simplistic or overly broad interpretation of section 2902 that wreaks havoc on, rather than preserves, the Legislature's intent.  *See, e.g., Bob Jones Univ.*, 461 U.S. at 586 (stating that a literal construction of a statute, "without regard to the object in view, . . . has never been adopted by any enlightened tribunal—because it is evident that in many cases it would defeat the object which the Legislature intended to accomplish" (quotation marks omitted)); *Me. Beer & Wine Wholesalers Ass'n*, 619 A.2d at 97.

[¶24]  Nowhere in the provisions of the UM coverage statute has the Legislature expressly stated that it applies to umbrella policies.  Instead, section 2902(1) states that it applies to "polic[ies] insuring against liability arising out of the ownership, maintenance or use of any motor vehicle . . . with respect to any such vehicle registered or principally garaged in this State."  In establishing the amount of UM coverage to be provided, section 2902(2) further describes those policies as "motor vehicle insurance policies."  Section 2902 contains no additional

detail as to the intended breadth of "motor vehicle insurance policies," nor does it contain any express mention of umbrella, excess, or supplemental policies of any kind.[5]

1. Minimum Recovery/Full Recovery Distinction

[¶25] Dickau relies in large part on the distinction between minimum recovery statutes and full recovery statutes to argue that section 2902 applies to his umbrella policy. According to this view, minimum recovery statutes—which require insurers to carry only a minimum level of UM insurance (generally to comply with the state's financial responsibility statute)—do not apply to umbrella policies because these statutes are intended to allow an injured person only the recovery to which he would be entitled if the at-fault party carried the minimum coverage required by statute. *Bartee v. R.T.C. Transp., Inc.*, 781 P.2d 1084, 1092 (Kan. 1989), *superseded by statute*, L. 1988, ch. 152, § 1, *as recognized in Fiorella v. Travelers Prop. Cas. Ins. Co.*, 142 P.3d 321 (Kan. Ct. App. 2006). This view further provides that full recovery statutes—which require UM coverage in an amount equivalent to the entire amount of bodily injury liability coverage for which the insured's policy provides—do apply to umbrella policies because they

---

[5] Maine is unlike New Hampshire, which has opted to expressly incorporate umbrella policies into its UM statute. N.H. Rev. Stat. Ann. § 264:15(1) (West, Westlaw through Chapter 330 of the 2014 Reg. Sess.) (requiring that "umbrella or excess policies . . . shall also provide the uninsured motorist coverage equal to the limits of liability purchased, unless the named insured rejects such coverage in writing").

are intended to afford an injured person with damages to the extent of the insured's policy limits. *Bartee*, 781 P.2d at 1092-93.

[¶26] As discussed below, we join other states in declining to draw such a distinction. *See Stoumen v. Pub. Serv. Mut. Ins. Co.*, 834 F. Supp. 140, 142 (E.D. Pa. 1993) ("[T]his Court does not believe that the type of uninsured motorist statute that a legislature chooses to adopt is dispositive of the issue of whether the legislature also intends to include umbrella policies within the statute's reach."); *Apodaca*, 255 P.3d at 1102 ("[W]e find the distinction drawn by other courts between 'minimum liability' and 'full recovery' UM/UIM statutes unpersuasive . . . , and do not rely on this reasoning."); *Rowe v. Travelers Indem. Co.*, 800 P.2d 157, 159 (Mont. 1990) ("[B]oth parties agree that the distinction between 'minimum liability' and 'full recovery' statutes is meaningless.").

[¶27] Our primary rationale for declining to make a distinction based on the "type" of recovery provided by the statute is that the process used by the Maine Legislature in enacting and amending section 2902 belies any suggestion that the Legislature intended to do so. As of 1969, section 2902 provided that Maine was a minimum recovery state, requiring UM coverage of "not less than the minimum limits for bodily injury liability insurance provided for under the motorists financial responsibility laws of this State." P.L. 1969, ch. 132, §§ 1, 21 (effective Sept. 1, 1969).

[¶28]   It was not until 1999 that the full recovery language that is now included in section 2902 was finally enacted.[6]  P.L. 1999, ch. 271, § 1 (effective Sept. 18, 1999).  Thus, Maine was a minimum recovery jurisdiction for the first thirty years after the UM statute was enacted, and has been a full recovery state only for the last fifteen years.  Notwithstanding the 1999 change in the *amount* of coverage required, in the forty-five years since section 2092 was enacted, the Legislature has never broadened the *class of policies* to which UM coverage applies.  Instead, it has maintained the parameters of UM coverage as applying to policies "insuring against liability arising out of the ownership, maintenance or use of any motor vehicle."  *Compare* 24-A M.R.S. § 2902(1) *with* P.L. 1969, ch. 132, § 1; *see Apodaca*, 255 P.3d at 1106-07.  Indeed, in 2005, the scope of the UM coverage that is required was curtailed rather than expanded by an amendment to section 2902 providing that only injuries "sustained by an insured person" would be compensable, in order to clarify that "an insurance policy may limit uninsured motorist coverage to the recovery of damages by an insured person."  P.L. 2005, ch. 591, § 1 (effective Aug. 23, 2006); L.D. 2021, Summary (122nd Legis. 2006).

---

[6]  In 1975, the Legislature briefly amended section 2902 in a way that rendered Maine a full recovery state.  P.L. 1975, ch. 437, § 2 (effective Oct. 1, 1975).  Just a few months later, however, the Legislature repealed the full recovery language of section 2902 in emergency legislation, declaring that the requirement that insured persons notify their insurer if they elected only the minimum UM coverage rather than the full policy limit was "unworkable" and "cause[d] confusion."  P.L. 1975, ch. 676 (emergency, effective Mar. 23, 1976).

Although this language is not at issue in the present matter, the amendment demonstrates the Legislature's intent to limit the scope of required UM coverage.

[¶29]  Also noteworthy is that although Maine's UM statute now has a full recovery component, it is not universally a full recovery statute.  Recovery up to the full value of coverage is the default provision as to personal automobile liability policies (i.e., those policies to which the MAICCA does apply).  24-A M.R.S. § 2902(2).  As to those policies to which the MAICCA does not apply, only minimum recovery is required.  24-A M.R.S. § 2902(2).  The scope of UM coverage that is required is otherwise identical whether the statute is applied to personal automobile liability policies or other policies, and we perceive no basis upon which to distinguish how the UM statute is applied to an umbrella policy based on whether or not the policy is a personal automobile liability policy.  The rationale for both types of UM coverage is the same: compensation for innocent insured injured persons.  Given that rationale, it would be absurd to make a distinction based on whether a portion of the statute provides for full recovery.  *See Doe*, 2014 ME 11, ¶ 15, 86 A.3d 600.[7]

---

[7]  We also note that other jurisdictions with full recovery statutes have refused to apply UM coverage requirements to umbrella policies.  The UM statute in Massachusetts, for example, provides for full recovery—"in amounts or limits prescribed for bodily injury or death for a liability policy"—but the Massachusetts Supreme Court holds that "an umbrella policy is not an auto liability insurance policy under [the] UM statute, and therefore need not provide UM benefits."  *Liberty Mut. Ins. Co. v. McLaughlin*, 590 N.E.2d 679, 680 & n.2 (Mass. 1992) (quoting Mass. Gen. Laws ch. 175, § 113L(1) (West, Westlaw through Chapter 389 of the 2014 2nd Annual Session)); *see also Archunde v. Int'l Surplus Lines Ins. Co.*, 905 P.2d 1128, 1130-31 (N.M. Ct. App. 1995) (holding that New Mexico's full

[¶30] Furthermore, some of the decisions that have relied on the minimum recovery/full recovery analysis have been superseded by statutes that now expressly exclude umbrella policies from UM requirements. *See Fiorella*, 142 P.3d at 325 (rejecting *Bartee* based on subsequent statutory amendments); *see also Continental Ins. Co. v. Howe*, 488 So. 2d 917, 920 (Fla. Dist. Ct. App. 1986) (discussing the Florida legislature's amendment of its full recovery UM statute to exclude umbrella policies, notwithstanding Florida's prior case law applying the UM statute to umbrella policies).

[¶31] For these reasons, we conclude that the difference between minimum recovery statutes and full recovery statutes is a meaningless distinction that sheds no light on the Legislature's intended scope of the application of section 2902.

2. "Motor Vehicle Insurance Policies"

[¶32] Dickau urges us to interpret "motor vehicle insurance policies," the term found in section 2902, to include any policy that contains *any* provision for any coverage of a motor vehicle, including umbrella policies. Because this interpretation would require us to ignore the history of insurance law, set aside the meaning of well-established terms of art, and reject the counsel of dozens of

---

recovery UM statute is "consonant with . . . [the] majority of jurisdictions" that have held that "issuers of excess liability insurance policies are not required to provide UM/UIM coverage").

18

decisions from other jurisdictions, we decline to interpret "motor vehicle insurance policies" in section 2902 as Dickau suggests.

[¶33] On numerous grounds, a majority of jurisdictions treat 'automobile or vehicle insurance,' or some derivation thereof, as a term of art with a meaning distinguishable from the references to motor vehicles found in an umbrella policy. *See, e.g.*, *Apodaca*, 255 P.3d at 1105; *Rowe*, 800 P.2d at 160. A motor vehicle insurance policy describes the particular drivers and the particular vehicles for which the insurance is afforded, and its premiums are calculated with reference to the specific attributes of those vehicles and drivers—i.e., the age, condition, and safety features of the vehicles, and the age and accident history of the insured drivers. *Apodaca*, 255 P.3d at 1105. Dickau's Dairyland policy, which he has already exhausted, is just such an automobile insurance policy. In contrast, Dickau's umbrella policy refers only to "[a]utos" in general, without describing any particular automobiles. The reference to "Autos You Own, Lease or Use Regularly" exists only for purposes of setting out the minimum underlying policy requirements.

[¶34] Section 2902 applies only to policies insuring specific vehicles registered or principally garaged in Maine. 24-A M.R.S. § 2902(1). Dickau's umbrella policy, in contrast, contains no such limitation.

[¶35]  Further, as its name suggests, motor vehicle insurance relates only to liability arising out of the use or ownership of motor vehicles.  Dickau's umbrella policy, in contrast, insures him against liability stemming from activities associated with his use of watercraft and aircraft, as well as homeowners' liability and general personal liability.  *See Apodaca*, 255 P.3d at 1105 ("[I]t would be equally inaccurate to label the umbrella policy an 'aircraft policy,' 'boat policy,' or 'homeowners policy.'").  As the Colorado Supreme Court stated in *Apodaca*, "[Colorado's UM] statute does not purport to apply to all 'liability' policies; it applies only to '*automobile liability* or *motor vehicle liability*' policies.  This language identifies a particular class of insurance policies that are inherently tethered to the ownership of a particular motor vehicle and the activity of driving."  *Id*. at 1105.

[¶36]  Motor vehicle insurance premiums, reflecting their status as primary insurance based on vehicle-specific liability, are also significantly higher than premiums for the catastrophic basic liability of umbrella policies.  *See S. Am. Ins. Co. v. Dobson*, 441 So. 2d 1185, 1188 (La. 1983).  "Unlike an automobile liability insurance policy, the umbrella policy is designed only to protect the insured against excess judgments, and the risks and premiums are calculated accordingly."  *Id*.  For motor vehicle insurance policies, the premiums are calculated according to "the risk of loss through the operation of motor vehicles covered by the policy."

*Id*. at 1189. Umbrella insurers "assume[] the much smaller risk of the insured's exposure to liability in excess of the limits of the underlying primary polic[y]." *Id*.; *see Metzger*, 360 So. 2d at 962; 8C John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 5071.65 (1981) ("Umbrella policies serve an important function in the industry. In this day of uncommon, but possible, enormous verdicts, they pick up this exceptional hazard at a small premium.").

[¶37] In summary, the very nature of UM coverage differs from that of umbrella coverage. UM coverage is "first-party coverage" in that it pays an amount to the insured based on a third party's liability; umbrella coverage is third-party coverage, payable to a third party based on the insured's liability. *Apodaca*, 255 P.3d at 1103; *see Rowe*, 800 P.2d at 160; *Moser v. Liberty Mut. Ins. Co.*, 731 P.2d 406, 410 n.16 (Okla. 1986).

[¶38] Given these many distinctions, other courts have interpreted umbrella policies as "wholly distinct classes of liability policies" that provide "generalized excess liability coverage" only tangentially tied to vehicles, as opposed to the traditional auto insurance policies to which UM statutes were intended to apply. *Apodaca*, 255 P.3d at 1105 ("[A]n umbrella policy is not transformed into an automobile or motor vehicle liability policy simply because it includes coverage for liability arising from the use of automobiles" (quotation marks omitted)); *Sidelnik v. Am. States Ins. Co.*, 914 S.W.2d 689, 694 (Tex. App. 1996) ("While the

[insureds'] umbrella policy provides excess coverage for liability arising from an automobile accident, this fact does not convert it into an 'automobile liability insurance' policy within the meaning of [Texas's UM statute].").    The Massachusetts Supreme Court, for example, has construed the "fair and reasonable meaning" of "motor vehicle liability policy" *not* to include umbrella liability provisions.    *Liberty Mut. Ins. Co. v. McLaughlin*, 590 N.E.2d 679, 679-81 (Mass. 1992) (quotation marks omitted).

[¶39]    Our holding in *Globe Indemnity* is also analogous.    In that case, Claudia Jordan was driving a vehicle lent to her by a car dealership when she struck and injured the insured.    634 A.2d at 1280-81.    The dealership carried a garage policy as well as an umbrella policy that "covered the same risks that the underlying Garage policy covered" up to a higher policy limit, both through the same insurer. *Id*. at 1281.    The dealership's insurer sought a declaratory judgment that the umbrella policy could not be accessed to defend or indemnify Jordan, who had her own motor vehicle insurance policy. *Id*. at 1281.    Jordan argued that, even if the dealership's primary garage policy only provided her with coverage up to the then-statutory minimums, the garage's umbrella policy could be accessed to cover any damages sustained by the injured party in excess of the garage policy limit. *Id.* at 1283.

[¶40]   We agreed with the dealership's insurer, stating that "[s]tatutes mandating minimum primary coverage are not intended to affect umbrella policies, and the statutes here do not operate to expand the contract language of [the umbrella policy]." *Id*.  In holding that the insurer was not bound to cover Jordan pursuant to the umbrella policy, we distinguished between underlying primary policies (the garage policy), which are mandated by statute, and excess policies (the umbrella policy), which are voluntary.  *Id*.  Although *Globe Indemnity* did not address UM coverage in particular, our analysis of the differences between primary and umbrella policies in that case indicates that UM statutory coverage requirements, like mandatory coverage minimums, may not be tied to umbrella policies by operation of law.[8]

[¶41]   Here, as we did in *Globe Indemnity*, we look to the very core of mandatory insurance requirements in this state.   Maine mandates that any "operator or owner of a vehicle registered in this State or required to be registered in this State" must maintain automobile liability insurance in minimum amounts as to property damage, injury or death, and medical payments.  29-A M.R.S. §§ 1601,

---

[8]   Just last year, the First Circuit completed a similar analysis in *Peerless Indemnity Ins. Co. v. Frost*, holding that although "the Law Court has never explicitly deemed the uninsured/underinsured motorist statute inapplicable outside the context of motor vehicle insurance policies, the court has repeatedly employed language to that effect," suggesting that the UM coverage requirement is limited to the underlying primary policy.  723 F.3d 12, 19 (1st Cir. 2013).  Ultimately, the First Circuit concluded, "In summary, given the legislative text, structure, history, and policy, as well as relevant case law from both within and without Maine, we predict that the Maine Law Court would hold that section 2902 does not apply to the [umbrella] polic[y] at issue in this case."  *Id*. at 24.

1605(1)(C) (2014). There is, however, no such express requirement for umbrella policies, or any other form of excess, secondary, or supplemental policy. Thus, it would be illogical for us to hold that the Legislature has placed mandatory UM coverage requirements on what is otherwise a completely voluntary form of insurance. *See Doe*, 2014 ME 11, ¶ 15, 86 A.3d 600.

[¶42] In sum, we conclude that, for purposes of the UM coverage provision, umbrella policies are not "motor vehicle insurance policies," and therefore the UM coverage requirements of section 2902 are not applicable to Dickau's umbrella policy. *See, e.g., Todd v. Federated Mut. Ins. Co.*, 409 S.E.2d 361, 365 (S.C. 1991) (characterizing auto insurance and umbrella insurance as "fundamentally different"); *Dobson*, 441 So. 2d at 1189 (stating that umbrella insurance and motor vehicle insurance are "wholly different in nature and purpose"); *Sidelnik*, 914 S.W.2d at 693 (discussing the "inherent differences between primary liability and umbrella policies").

[¶43] The legislative intent underlying section 2902 is to protect insured people injured in motor vehicle accidents caused by uninsured or underinsured drivers. The protection provided gives those injured persons insurance coverage in an amount equal to what they would have obtained if the uninsured or underinsured driver and vehicle were insured to the same extent as the injured person and his vehicle. *See Moser*, 731 P.2d at 408. That purpose is fully

achieved by applying section 2902 to statutorily-required motor vehicle insurance policies. *See Mass*, 610 A.2d at 1194 (stating that the rationale for Connecticut's UM statute—"to ensure that insureds receive more than the bare minimum of uninsured motorist coverage in recognition of the often catastrophic consequences of automobile collisions and the gross inadequacy of statutory minimum coverages"—is adequately served even by interpreting the statute not to apply to a personal excess policy (alterations omitted) (quotation marks omitted)); *Todd*, 409 S.E.2d at 365 ("The underlying primary policy provides the insured with all the benefits accorded under [the] uninsured motorist statutes."); *Dobson*, 441 So.2d at 1189 ("This object has been achieved by the underlying primary automobile liability insurance policy . . . [and w]e see no reason to strain the interpretation [of the UM statute]."); *Hartbarger v. Country Mut. Ins. Co.*, 437 N.E.2d 691, 694 (Ill. App. Ct. 1982) ("[T]he insureds had received the protection of the mandatory uninsured motorist coverage statute through their primary automobile liability policy and were thus not left without the relief anticipated by that law.").

[¶44] We conclude that the Legislature did not intend for section 2902 to provide the universe of coverage argued by Dickau; to determine otherwise would be to rewrite section 2902 to accommodate a remedy significantly greater than the Legislature intended. *See Hartbarger*, 437 N.E.2d at 694 ("It does not give us the authority to rewrite the unambiguous provisions of the umbrella policy in order to

expand the maximum coverage afforded to the plaintiff, and we will not do so."); *Moser*, 731 P.2d at 409 ("[T]he excess coverage . . . is beyond the contemplation, scope and intent of [Oklahoma's UM statute], which we find to be limited in application to policies insuring against primary liability . . . ."). We decline to do so.

The entry is:

Judgment affirmed.

---

SILVER, J., with whom ALEXANDER and JABAR, JJ., join, dissenting.

[¶45] I respectfully dissent. The Court's holding is at odds with our rules of statutory construction and the very purpose of the uninsured motorist statute. For the reasons below, I would conclude that section 2902 unambiguously applies to an umbrella policy that is linked to a primary automobile policy.

[¶46] "The purpose of the [uninsured motorist] statute is to permit an injured party to receive the same recovery as would have been available to him or her had the tortfeasor carried an equivalent level of insurance." *Molleur v. Dairyland Ins. Co.*, 2008 ME 46, ¶ 10, 942 A.2d 1197; *see Wescott v. Allstate Ins.*, 397 A.2d 156, 166 (Me. 1979) ("The legislative intent is to benefit all insured motorists by throwing the burden of compensating for injuries which would

otherwise go without redress from the individual victim to the insurance industry for a premium."). "By enacting section 2902, the Legislature has . . . indicated a strong public policy in favor of the just compensation of accident victims." *Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 34, 989 A.2d 733 (quotation marks omitted); *see Pease v. State Farm Mut. Auto. Ins. Co.*, 2007 ME 134, ¶ 16, 931 A.2d 1072 (noting "the legislative intent to close coverage gaps rather than endorse patchwork policies that leave responsible, insured consumers without the protection they have paid for" (Silver, J., concurring)).

[¶47] As a general rule of statutory interpretation, "[w]e seek to discern from the plain language of the statute the real purpose of the legislation, avoiding results that are absurd, inconsistent, unreasonable, or illogical. If the statutory language is clear and unambiguous, we construe the statute in accordance with its plain meaning in the context of the whole statutory scheme." *State v. Mourino*, 2014 ME 131, ¶ 8, --- A.3d. --- (quotation marks omitted). Given its broad intent to "benefit all insured motorists," *Wescott*, 397 A.2d at 166, we employ an additional rule of construction when interpreting the uninsured motorist statute. In order to properly "effectuate the purposes of this remedial statute, we construe the protections of section 2902 liberally in favor of insureds and strictly against insurers." *Beal*, 2010 ME 20, ¶ 34, 989 A.2d 733; *see Molleur*, 2008 ME 46, ¶ 10, 942 A.2d 1197 ("This purpose is effected by interpreting the statute liberally in

favor of insured individuals and by strictly interpreting it against insurers."). Only if a statute is ambiguous do we consider its legislative history. *Strout v. Cent. Me. Med. Ctr.*, 2014 ME 77, ¶ 10, 94 A.3d 786.

[¶48] Against that backdrop, we must determine whether section 2902(1), which applies to all "polic[ies] insuring against liability arising out of the ownership, maintenance or use of any motor vehicle . . . with respect to any such vehicle registered or principally garaged in this State," 24-A M.R.S. § 2902(1) (2014), applies to an umbrella policy that provides coverage in excess of the limits of a primary automobile policy. The Supreme Court of Vermont addressed this very question in 2009.[9] It concluded that "[i]n providing clearly and unambiguously that '[n]o policy' insuring 'against liability arising out of the ownership, maintenance or use of any motor vehicle' may issue without [uninsured and underinsured motorist] coverage, the statute plainly encompasses the excess policies here at issue." *Ins. Co. of State of Pennsylvania v. Johnson*, 987 A.2d 276, 279 (Vt. 2009) (second alteration in original). Like the language of

---

[9] Notably absent from the Court's opinion is any reference to *Insurance Company of the State of Pennsylvania v. Johnson*, 987 A.2d 276 (Vt. 2009). The Court correctly notes that it applies the law of Maine, not Vermont, to the present action. Court's Opinion ¶ 3 n.1. It thus ignores *Johnson* completely but goes on to cite cases from, inter alia, Colorado, Alabama, Oregon, Kansas, Montana, Florida, Massachusetts, New Mexico, Washington, Louisiana, Oklahoma, Texas, South Carolina, and Illinois to make its point. For the reasons discussed in *Johnson*, those cases are inapplicable to the circumstances here. *See Johnson*, 987 A.2d at 282 ("More important than the numbers, however, are the reasons underlying the decisions. . . . [C]ourts applying UM/UIM statutes predicated—like [the Vermont UM statute]—on the type of *coverage* rather than the type of *policy* have concluded that the statute's plain language compels the inclusion of excess or umbrella policies.").

the provision at issue in *Johnson*, the plain language of section 2902 does not discriminate between primary motor vehicle insurance policies and umbrella policies. *See id.* at 280 ("It is a substantial stretch . . . to conclude that [the] reference to policies 'insuring against liability arising out of the ownership, maintenance or use of any motor vehicle' must, therefore, have also been intended to refer solely to primary automobile policies.").

[¶49] Section 2902(1) is based on the nature of the coverage, not the type of insurance policy. *See id.* at 282. An umbrella policy will fall within the scope of section 2902 if it provides coverage for liability that "aris[es] out of the ownership, maintenance or use of any motor vehicle." The umbrella policy does so here—in its schedule of minimum primary insurance requirements, the policy refers to "Auto Liability Insurance (including Uninsured/Underinsured Motorist Coverages Where Required By Law) For Autos You Own, Lease, or Use Regularly." Read plainly, and in light of our mandate to construe section 2902 "liberally in favor of insureds and strictly against insurers," the statute applies to the umbrella policy. *Beal*, 2010 ME 20, ¶ 34, 989 A.2d 733.

[¶50] The Court points out that "[s]ection 2902 applies only to policies insuring specific vehicles registered or principally garaged in Maine," and notes that Dickau's umbrella policy does not refer to a particular vehicle. Court's Opinion ¶ 33-34. But the statute's application to policies "insuring specific

vehicles" does not exclude Dickau's umbrella policy from its requirements, for two reasons. First, uninsured motorist coverage, "[u]nlike liability coverage, . . . inures to the person, not the vehicle." *Pease*, 2007 ME 134, ¶ 15, 931 A.2d 1072 (Silver, J., concurring) (quotation marks omitted); *see Johnson*, 987 A.2d at 280-81 ("Of course, uninsured motorist coverage, much like the excess or umbrella policies here at issue, is designed for the protection of persons, not vehicles." (quotation marks omitted)). Because section 2902 requires coverage that inures to a person and not the specific covered vehicle, that the umbrella policy does not refer to a specific covered vehicle does not bring it outside of the Legislature's intent to require coverage.

[¶51] Second, the umbrella policy *does* insure Dickau's specific vehicle. By their very nature, umbrella policies are "generally conditioned on the existence of one or more primary coverages." *Johnson*, 987 A.2d at 281 (quotation marks omitted). Dickau's insurance policy required an underlying motor vehicle insurance policy before it would provide coverage. That underlying motor vehicle policy provides coverage "with respect to" Dickau's vehicle. Therefore, the umbrella policy provides coverage "with respect to" that vehicle. *See, e.g.*, *Rebernick v. Wausau Gen. Ins. Co.*, 711 N.W.2d 621, 626 (Wis. 2006) ("The terms of the [umbrella] policy require, as a condition of insurance, that there be underlying automobile insurance coverage in a specified amount. The underlying

primary automobile policy, in turn, refers to a particular motor vehicle. Thus, the . . . umbrella policy insures 'with respect' to a particular motor vehicle that is named or described in the policy by incorporation of the underlying policy.").

[¶52] The Court turns our rule of construction on its head by interpreting section 2902 liberally in favor of insurance carriers and strictly against insured motorists. *See Wescott*, 397 A.2d at 169 (noting that "this remedial statute must be construed liberally in favor of the insured victim and strictly against the insurer"). In emphasizing that we must not read a statute literally if it "thwarts the clear legislative objective," *Doe v. Reg'l Sch. Unit 26*, 2014 ME 11, ¶ 15, 86 A.3d 600 (quotation marks omitted), the Court implies that reading the uninsured motorist statute so as to encompass umbrella policies would be "inimical to the public interest" and "wreak[] havoc" on the intent of the Legislature. *See* Court's Opinion ¶¶ 21, 23. In order to reach this conclusion, however, the Court ignores the very purpose of section 2902, which is to benefit all insured motorists by "permit[ting] an injured party to receive the same recovery as would have been available to him or her had the tortfeasor carried an equivalent level of insurance." *Molleur*, 2008 ME 46, ¶ 10, 942 A.2d 1197; *see Wescott*, 397 A.2d at 166. In this case, going beyond the plain language of section 2902—which the Court does here by reading an exclusion into the statute that does not exist—"defeat[s] the plain purpose of the statute," *Bob Jones Univ. v. United States*, 461 U.S. 574, 586

(1983), and thwarts the Legislature's support for "a strong public policy in favor of the just compensation of accident victims." *Beal*, 2010 ME 20, ¶ 34, 989 A.2d 733 (quotation marks omitted).

[¶53] In the absence of any language in section 2902 that suggests that its reach is limited to primary policies, the statute should not be read so narrowly in order to avoid its application when an injured insured has elected to purchase an umbrella policy with higher liability coverage. The Court bends over backward to avoid applying section 2902 to umbrella policies and, in doing so, contravenes our mandate to interpret "the protections of section 2902 liberally in favor of insureds and strictly against insurers." *Beal*, 2010 ME 20, ¶ 34, 989 A.2d 733 (quotation marks omitted).

[¶54] For these reasons, I conclude that the uninsured motorist statute unambiguously applies to Dickau's umbrella policy. Accordingly, I would vacate the judgment of the Superior Court and remand for judgment in favor of Dickau.

---

**On the briefs:**

Steven D. Silin, Esq., and Robert H. Furbish, Esq., Berman & Simmons, P.A., Lewiston, for appellant James M. Dickau

James D. Poliquin, Esq., Norman, Hanson, & DeTroy, LLC, Portland, for appellee Vermont Mutual Insurance Company

32

**At oral argument:**

Robert H. Furbish, Esq., for appellant James M. Dickau

James D. Poliquin, Esq., for appellee Vermont Mutual Insurance Company

Kennebec County Superior Court docket number CV-2012-168
FOR CLERK REFERENCE ONLY