Codiejo APODACA, n/k/a Codiejo Martinez, and Michelle I. Carlton, Petitioners

v.

ALLSTATE INSURANCE COMPANY, an Illinois insurance corporation, Respondent.

No. 10SC39.

Supreme Court of Colorado, En Banc.

June 20, 2011.

Hagens Berman Sobol Shapiro, LLP, Robert B. Carey Megan E. Waples, Colorado Springs, Colorado, The Gold Law Firm, L.L.C., Colleen Parsley, Gregory A. Gold, Greenwood Village, Colorado, Attorneys for Petitioners.

Wheeler Trigg O'Donnell LLP, John Vaught, Terence M. Ridley, Denver, Colorado, Meckler Bulger & Tilson LLP, Peter J. Valeta, Chicago, Illinois, Attorneys for Respondent.

Justice MÁRQUEZ delivered the Opinion of the Court.

The Uninsured Motorist Act, section 10–4–609, C.R.S. (2010), requires insurers to offer uninsured/underinsured motorist ("UM/UIM") coverage with every "automobile liability or motor vehicle liability" policy sold in Colorado. In *Apodaca v. Allstate Insurance Co.*, 232 P.3d 253, 258 (Colo.App. 2009), the court of appeals held that this statutory requirement does not apply to umbrella policies. We granted a petition for a writ of certiorari to review the court of appeals' ruling, and now affirm.

In June 2002, Codiejo Apodaca (now Codiejo Martinez) and her stepsister Michelle I. Carlton ("insureds"), were injured in an automobile accident. At the time of the accident, the insureds were covered as resident relatives under an auto policy and a personal umbrella policy both issued by Allstate Insurance Company ("Allstate" or the "insurer"). The auto policy included UM/UIM coverage in the amount of $100,000 per person and $300,000 per accident, which matched the auto policy's bodily injury liability limits. The umbrella policy provided $1 million in excess liability coverage for "occurrences" arising out of, among other things, "occupancy of a land vehicle ... by an insured for personal transportation." It is undisputed that Allstate did not separately offer UM/UIM coverage in connection with the umbrella policy.

The insureds brought suit against Allstate seeking judicial reformation of the umbrella policy to include UM/UIM coverage. In their view, section 10–4–609(1)(a), C.R.S. (2010), requires Allstate to offer UM/UIM

coverage in connection with the umbrella policy because the policy includes automobile liability coverage. Thus, the insureds contend, UM/UIM coverage should be deemed incorporated into the umbrella policy as a matter of law.

The trial court granted Allstate's C.R.C.P. 12(b)(5) motion to dismiss. It reasoned that only liability policies expressly linked to a specific, licensed Colorado motor vehicle are required to include the mandatory offer of UM/UIM insurance.

The court of appeals affirmed. Based on the plain language of the UM/UIM statute and Colorado's "minimum recovery" system, the court of appeals held that umbrella policies do not fall within the ambit of section 10–4–609 and thus "are not subject to the UM/UIM coverage requirements of that statute." *Apodaca*, 232 P.3d at 258.

We affirm. We hold that an umbrella policy is not an "automobile liability or motor vehicle liability policy" as specified in section 10–4–609(1)(a); therefore, Allstate had no obligation to offer UM/UIM coverage in connection with the umbrella policy.

## I. Facts and Procedural Background

At the time of the June 2002 accident, the insureds were both minors covered as resident relatives under an Allstate "Auto Insurance Policy" ("auto policy") and an Allstate "Personal Umbrella Policy" ("umbrella policy"), both held by Steven Carlton ("policyholder"), who is Michelle Carlton's father and Codiejo Martinez's stepfather. Among other types of coverage, the auto policy provided "automobile liability insurance" for each vehicle up to $100,000 per person and $300,000 per accident. It also provided uninsured/underinsured motorists insurance for bodily injury in the matching limits of $100,000 per person and $300,000 per accident.

The auto policy identified four specific vehicles for coverage. For each vehicle, the policy reflected a premium based on factors specific to that vehicle, including the vehicle's

year, make, and model, as well as the nature and extent of coverage purchased (e.g., automobile liability insurance, personal injury protection benefits, auto collision insurance, auto comprehensive coverage, rental reimbursement coverage, and coverage for property damage caused by uninsured motorists). The premium for each vehicle also reflected discounts (e.g., for passive restraint systems or antilock brakes); surcharges (e.g., for an inexperienced operator); and rating information based on vehicle usage patterns specific to the vehicle and its driver.

The umbrella policy provided up to $1 million in generalized excess liability coverage. The policy provided that Allstate would pay when an insured became liable to others for personal injury, property damage, or bodily injury caused by an "occurrence" (defined to include an accident) arising out of the personal activities of an insured, civic services performed by an insured, or "the occupancy of a land vehicle, aircraft, or watercraft by an insured for personal transportation." The umbrella policy required the insured to maintain underlying primary auto liability insurance coverage in minimum amounts of $100,000 per person and $300,000 per accident, and paid benefits when those underlying policy limits were exceeded. In contrast to the auto policy, the umbrella policy charged a single premium for "basic liability." The declarations page simply noted that this premium included a charge for "4 automobiles" and "a young driver." The umbrella policy did not include UM/UIM coverage; indeed, it specifically excluded coverage for "personal injury or bodily injury to an insured."

The insureds brought this suit against Allstate [1] alleging that their severe and disabling injuries were caused by an at-fault, underinsured driver. The insureds sought to have the umbrella policy judicially reformed to contain UM/UIM coverage. They contended that Allstate was required to offer UM/UIM coverage for the umbrella policy

---

**1.** The insureds brought additional claims related to the enhanced personal injury protection ("PIP") benefits and the UM coverage contained in the underlying auto policy, as well as claims for negligence against the Allstate agent who sold the policies at issue. All of these additional claims were either dismissed by the trial court or voluntarily withdrawn by the insureds, and are not before us.

under section 10–4–609(1)(a) and, because Allstate failed to do so, the coverage should be deemed incorporated into the umbrella policy as a matter of law.

The trial court rejected this claim, reasoning that section 10–4–609(1)(a) applies only to liability insurance policies issued or delivered in Colorado that directly concern or have a demonstrable relationship to "any motor vehicle licensed for highway use in this state." The court concluded that the umbrella policy is not the type of liability policy subject to a mandatory offer of UM/UIM coverage because it neither refers to any specific, licensed Colorado motor vehicle, nor limits its coverage to motor vehicle related liability.

The court of appeals affirmed, likewise concluding that umbrella policies are not included under section 10–4–609. *Apodaca,* 232 P.3d at 258. The court reasoned that "[a]utomobile or motor vehicle insurance insures the owner or operator of a motor vehicle against liability arising out of the ownership and operation of designated motor vehicles." *Id.* at 257. In contrast, the umbrella policy provides "general liability coverage and requires [an underlying] primary insurance policy with minimum liability limits as to those risks or activities for which specialized liability insurance is generally available and commonly purchased." *Id.* Although the court of appeals based its conclusion on the plain language of section 10–4–609(1)(a) and its context, it also found persuasive the decisions from appellate courts from other states with similar UM/UIM provisions. The court of appeals described Colorado's statutory scheme as a "minimum recovery system" under which insurers are required to provide UM/UIM coverage only in the minimum amounts established by the Motor Vehicle Financial Responsibility Act ("MVFRA"). It observed that appellate courts in states with similar "minimum recovery" systems generally have concluded that umbrella policies are not subject to UM/UIM coverage requirements. *Id.* at 258. Finally, the court of appeals

rejected the argument that public policy requires UM/UIM coverage to be included in umbrella policies. *Id.* at 258–59.

## II. Analysis

The issue before us is whether an umbrella policy that includes supplemental liability coverage for automobiles or motor vehicles is an "automobile liability or motor vehicle liability policy" under section 10–4–609(1)(a), thereby requiring the insurer to offer UM/UIM coverage as part of the policy.[2] We examine the plain language of the statute and hold that the UM/UIM requirements do not apply to general liability policies such as the umbrella policy at issue here. Unlike the court of appeals, we find the distinction drawn by other courts between "minimum liability" and "full recovery" UM/UIM statutes unpersuasive as applied to Colorado's provisions, and do not rely on this reasoning. Finally, we reject the insureds' arguments that public policy considerations compel a different interpretation of section 10–4–609.

### A. Standard of Review

■ We review a court's C.R.C.P. 12(b)(5) dismissal of a complaint for failure to state a claim de novo. *Bly v. Story,* 241 P.3d 529, 533 (Colo.2010). In doing so, we take the allegations as stated in the complaint as true. *Simon v. State Comp. Ins. Auth.,* 946 P.2d 1298, 1299 (Colo.1997).

■ Whether umbrella policies fall within the requirements of Colorado's UM/UIM statute is a question of statutory interpretation that we likewise review de novo. *Shelter Mut. Ins. Co. v. Mid–Century Ins. Co.,* 246 P.3d 651, 660–61 (Colo.2011). When interpreting a statute, "[o]ur primary duty ... is to ascertain and effectuate the intent of the General Assembly." *Id.* We begin with the statute's express language, "construing words and phrases according to grammar and common usage." *Jefferson Cnty. Bd. of Equalization v. Gerganoff,* 241 P.3d 932, 935 (Colo.2010). Ultimately, "our interpretation

**2.** We granted certiorari review on the following question:
　Whether the court of appeals erred in deciding, on a question of first impression, that the

provisions of the Colorado Uninsured Motorist Act do not apply to supplemental liability policies that provide automobile liability insurance.

should give consistent, harmonious, and sensible effect to all parts of a statute." *Id.*

### B. Primary and Excess Liability Policies

■ In general, a primary liability policy "provides the first layer of coverage[,] attach[ing] immediately upon the happening of an occurrence or when a claim is made." 1 Jeffrey E. Thomas, *New Appleman on Insurance Law Library Edition* § 1.06[7] (Dec. 2010); 1 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 1:4 (3d ed. 2010) (defining a "primary insurer" as "an insurer whose coverage of a given loss is at the 'first level' of loss (after satisfaction of any deductible); counterpart of excess insurer"). A primary liability policy that covers automobiles or motor vehicles protects the insured from liability for damages arising from the ownership, maintenance, or use of specific automobiles. In other words, if an insured is at fault in an automobile accident, the insurer covers an injured third party's damages beyond the insured's deductible, up to the limits of the insured's automobile liability coverage. Here, the automobile liability insurance coverage under the Allstate auto policy serves as primary liability coverage.

■ By contrast, excess and umbrella policies "protect the insured in the event of a catastrophic loss in which liability exceeds the available primary coverage." 15 *Couch on Insurance* § 220:32. An excess liability policy pays benefits only after the limits of the primary or underlying insurance policy have been exhausted. 1 *New Appleman on Insurance Law Library Edition* § 1.06[7]; *see also* 1 *Couch on Insurance* § 1:4 (defining an "excess insurer" as "an insurer whose coverage of a given loss is activated only after the magnitude of the loss exceeds the limits of applicable 'primary' insurance"). Excess liability policies assume the less frequent risk that an insured will be liable for a judgment that exceeds the primary policy's limits. Accordingly, excess liability policies carry lower premiums that reflect the lesser magnitude of this risk. *See Trinity Universal Ins. Co. v. Metzger*, 360 So.2d 960, 962 (Ala.1978).

An umbrella policy is a distinct type of excess liability policy. However, in addition to providing excess liability coverage, an umbrella policy typically also provides primary coverage for certain risks that an underlying liability policy does not cover. *See* 15 *Couch on Insurance* § 220:32. In that sense, an umbrella policy may act as a "gap-filler" by providing "first dollar liability coverage where a primary policy and an excess policy do not." 1 *New Appleman on Insurance Law Library Edition* § 1.06[7] (quoting Douglas R. Richmond, *Rights and Responsibilities of Excess Insurers*, 78 Denv. U.L.Rev. 29, 31 (2000)). With respect to automobiles, the umbrella policy in this case only provided excess liability coverage for occurrences arising from the ownership, maintenance, or use of a land motor vehicle, and required the policyholder to maintain underlying automobile liability coverage with minimum limits of $100,000 per person and $300,000 per accident.

### C. UM/UIM Coverage Generally

While a traditional auto liability policy protects an insured from liability to third parties, uninsured and underinsured motorist coverage "is not liability insurance in any sense." 9 *Couch on Insurance* § 122:2. Rather, UM/UIM coverage is first-party coverage; it allows an insured to collect payment from his own insurer for injury suffered as a result of the actions of an at-fault uninsured or underinsured driver. *Id.* UM/UIM coverage is inherently complementary to auto liability insurance; both coverages are directly anchored in the activities of driving.

■ UM/UIM coverage has become widely available in the United States as the result of legislative efforts to provide compensation to insured motorists injured by uninsured or underinsured at-fault drivers who failed to carry adequate liability insurance. *Id.* UM/UIM coverage assures that motorists who have purchased automobile or motor vehicle liability insurance can obtain compensation from their own insurer in the event they are injured by a negligent driver who lacks adequate liability insurance.

## D. Colorado's UM/UIM Statute

■ With this background in mind, we turn to Colorado's UM/UIM statute. Section 10–4–609(1)(a) provides:

No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle licensed for highway use in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 42–7–103(2), C.R.S. [the Motor Vehicle Financial Responsibility Act ("MVFRA") ], under provisions approved by the commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; except that the named insured may reject such coverage in writing.[3]

In short, this provision requires that any issuer of an "automobile liability or motor vehicle liability policy" provide UM/UIM coverage in the limits set forth in the MVFRA unless the policyholder expressly rejects such coverage in writing.[4] *See Aetna Cas. & Sur. Co. v. McMichael,* 906 P.2d 92, 101 (Colo.1995) (stating that "[s]ection 10–4–609(1) compels UM/UIM coverage for all those covered under the liability provisions of an automobile insurance policy"). The limits set forth in the MVFRA are not less than twenty-five thousand dollars per person and fifty thousand dollars for two or more per-

sons in any one accident. § 42–7–103(2), C.R.S. (2010).

■ By enacting the UM/UIM requirement, the legislature thus chose to ensure that a purchaser of an automobile or motor vehicle liability insurance policy has the opportunity to be compensated "to the same extent as one injured by a motorist who is insured in compliance with the [MVFRA]." *Terranova v. State Farm Mut. Auto. Ins. Co.,* 800 P.2d 58, 62 (Colo.1990); *see also Alliance Mut. Cas. Co. v. Duerson,* 184 Colo. 117, 123, 518 P.2d 1177, 1180 (1974) (explaining that this provision of the UM/UIM statute "mandates only that insurance companies make available uninsured motorist coverage in an amount as prescribed by the [MVFRA]").

Over time, the General Assembly has increased the amount of UM/UIM coverage that an insured may purchase. Section 10–4–609(2), C.R.S. (2002), states that before issuing or renewing the policy, the insurer must offer UM/UIM coverage in an amount up to the insured's underlying bodily injury liability limits, or $100,000 per person and $300,000 per accident, whichever is less.[5] Thus, insureds may elect UM/UIM coverage in amounts that exceed the minimum limits established in the MVFRA.

■ If an insurer fails to offer the required coverage, or if the policyholder does not reject the offered coverage in writing, the policy will be interpreted to include UM/UIM coverage. *McMichael,* 906 P.2d at 101 (explaining that "[c]ourts faced with insurance policies that violate mandatory coverage requirements have read those requirements into the policy").

---

**3.** This statute was originally enacted in 1965. *See* ch. 91, sec. 2, § 72–12–19, 1965 Colo. Sess. Laws 334. The original language of this provision is essentially identical to the present-day version.

**4.** Although the plain language of section 10–4–609(1)(a) refers only to "owners or operators of *uninsured* motor vehicles," subsection (4) further explains that uninsured motorist coverage includes *underinsured* motorist coverage as well. *See* § 10–4–609(4), C.R.S. (2010) (emphasis added). For ease of reference, we refer in this

opinion to these provisions collectively as the "UM/UIM statute."

**5.** Because the accident at issue in this case occurred in 2002, we consider the 2002 version of the statute. In 2007, this provision was amended to remove the $100,000/$300,000 cap. Ch. 413, sec. 2, § 10–4–609(2), 2007 Colo. Sess. Laws 1921–22. Presently, an insurer must offer "the named insured the right to obtain uninsured motorist coverage in an amount equal to the insured's bodily injury liability limits." § 10–4–609(2), C.R.S. (2010).

In this case, it is undisputed that the policyholder purchased UM/UIM coverage in the limits of $100,000 per person and $300,000 per accident in the underlying auto policy. It is also undisputed that Allstate did not offer UM/UIM coverage in the umbrella policy. Thus, whether the policyholder is entitled to UM/UIM coverage in the umbrella policy turns on whether the umbrella policy falls within the type of insurance policies regulated by the UM/UIM statute. We conclude it does not.

### 1. Statutory Interpretation
#### a. Plain Language

■ We have not found, and the parties have not cited, any Colorado statute that governs umbrella policies. Thus, we turn to the plain language of the UM/UIM statute to address the question before us. The UM/UIM statute requires insurers who issue "automobile liability or motor vehicle liability polic[ies] insuring against loss resulting from liability ... arising out of the ownership, maintenance, or use of a motor vehicle ... licensed for highway use" in Colorado to offer and provide UM/UIM coverage. *See* § 10–4–609(1)(a).

The statute does not purport to apply to all "liability" policies; it applies only to "*automobile liability* or *motor vehicle* liability" policies. This language identifies a particular class of insurance policies that are inherently tethered to the ownership of a particular motor vehicle and the activity of driving.

Moreover, the statute applies only to policies that are delivered or issued in Colorado "*with respect to any motor vehicle licensed for highway use in this state.*" § 10–4–609(1)(a) (emphasis added). This language similarly instructs that a policy governed by the UM/UIM statute is one that provides liability coverage for specifically identified vehicles licensed for use in the state.

The auto policy here designates the four particular vehicles covered and calculates premiums based on considerations specific to that vehicle (e.g., year, make, and model; the factors decreasing or increasing risk; the nature of particular coverages desired; and the vehicle's usage patterns and driver characteristics). The policy has a logical and direct connection to the insured's ownership and use of specific, identified automobiles or motor vehicles.[6]

In contrast, the umbrella policy is a general liability policy. The calculation of its "basic liability" premium is not tethered to specific aspects of the policyholder's automobiles or their use. The declarations page simply notes that the premium includes a charge "for 4 automobiles" and "for a young driver." The umbrella policy at issue here is not inherently tied to particular automobiles or motor vehicles, or even the activity of driving. Instead, the purpose of the policy is to provide a broad "umbrella" of general excess third-party coverage to protect the insured from catastrophic liability arising from a wide range of activities. With respect to automobiles, the policy provides excess liability coverage should the insured incur legal liability to others beyond $100,000 per person or $300,000 per accident. But an umbrella policy is not transformed into an "automobile or motor vehicle liability policy" simply because it includes coverage for liability arising from the use of automobiles. An umbrella policy is an inherently different type of policy. As Allstate observes, it would be equally inaccurate to label the umbrella policy an "aircraft policy," "boat policy," or "homeowners policy."

In sum, an umbrella policy is not an "automobile liability or motor vehicle liability policy" under the plain language of section 10–4–609(1)(a). Consequently, the statute does not require an insurer to offer UM/UIM coverage as part of an umbrella policy.[7]

---

**6.** Although the auto policy provides a variety of other coverages, these coverages directly concern the use and ownership of particular automobiles, including personal injury protection, collision, comprehensive, towing, lease or loan gap, sound system, and tapes and compact discs coverage.

**7.** Allstate argues the definition of "policy" in section 10–4–601(10), C.R.S. (2010), should ap-

ply in the instant case. The insureds contend this definition does not apply to interpreting the UM/UIM statute, and cite *Passamano v. Travelers Indemnity Co.*, 882 P.2d 1312, 1320–21 (Colo. 1994), where we rejected the applicability of the definition of "policy" in section 10–4–601 in construing the UM/UIM statute. Because we rely on the plain language of section 10–4–609, we need

### b. "Minimum Liability" versus "Full Recovery" UM/UIM Statutes

Because section 10–4–609(1)(a) ties the required offer of UM/UIM coverage to the amounts established in the MVFRA, Allstate urges us to follow the "minimum liability" approach adopted by some appellate courts in states with similar UM/UIM statutes. Under this approach, courts have declined to include umbrella policies within their state's UM/UIM mandate, reasoning that their legislatures intended only to offer the insured the option of matching what he or she would have collected had the other party carried the minimum coverage required under the financial responsibility laws of their state. *See* Lisa K. Gregory, Annotation, *"Excess" or "Umbrella" Insurance Policy as Providing Coverage for Accidents with Uninsured or Underinsured Motorists,* 2 A.L.R.5th 922 § 2[a] (1992 & 2010 Supp.).

Although the court of appeals found this approach persuasive, we decline to view the distinction between "minimum liability" and "full recovery" statutes as dispositive of the issue before us. To label Colorado's UM/UIM statute a "minimum liability" statute based on the reference to the MVFRA in section 10–4–609(1) oversimplifies the interplay between sections 10–4–609(1)(a) and (2). Read together, these provisions make clear that insureds may elect UM/UIM coverage in greater than the MVFRA minimum limits. Thus, we instead rely on the plain language of Colorado's UM/UIM statute to hold that umbrella policies are not included within the UM/UIM mandate of section 10–4–609(1)(a).

### 2. Public Policy Considerations

The insureds argue that the legislative goal of "maximizing coverage" requires us to construe "automobile liability or motor vehicle liability policy" broadly to include UM/UIM coverage. In their view, the "fact that UM coverage functions differently from liability coverage is not a reason to exclude personal umbrella policies, but is instead one of the very reasons behind the mandatory offer required by Colorado's statute." We are not persuaded that public policy considerations compel us to reach a different conclusion regarding the scope of section 10–4–609.

The insureds correctly note that since the UM/UIM statute was enacted in 1965 the General Assembly has acted several times to expand UM/UIM coverage. The statute originally required insurers only to offer uninsured motorist coverage, and only in the minimum amount required by the MVFRA. In 1983, the legislature expanded the statute to include underinsured motorists. Ch. 92, sec. 1, § 10–4–609(4), 1983 Colo. Sess. Laws 455. In that year, it also acted to require insurers to offer higher limits of coverage up to the insured's bodily injury liability limits, or $100,000 per person and $300,000 per accident, whichever was less. Ch. 92, sec. 1, § 10–4–609(2), 1983 Colo. Sess. Laws 454.

In 1992, the legislature enacted provisions permitting insurers to prohibit stacking the limits of more than one UM/UIM policy if such provisions appear in a single policy covering multiple vehicles or in multiple policies issued by a single insurer. Ch. 212, sec. 4, § 10–4–609(2), 1992 Colo. Sess. Laws 1759. More recently, however, the General Assembly removed the anti-stacking provisions enacted in 1992, and expanded the circumstances under which an insured would be legally entitled to collect UM/UIM coverage under his or her auto policy. Ch. 413, secs. 1 & 2, §§ 10–4–609(1)(c), (2) & (4), 2007 Colo. Sess. Laws 1921–22. It also removed the $100,000 and $300,000 cap on UM/UIM coverage, giving policy purchasers the right to obtain coverage in an amount equal to the insured's own bodily injury liability limits. *Id.* In 2010, the General Assembly added section 10–4–609(6), which makes it easier for insured parties to have an alleged tortfeasor "deemed to be uninsured" for the purposes of receiving UM/UIM coverage payments. Ch. 196, sec. 1, § 10–4–609(6), 2010 Colo. Sess. Laws 845–46; *see also,* ch. 196, secs. 2 & 3, §§ 42–7–102(2) & 42–7–414(3), 2010 Colo. Sess. Laws 846–48.

Despite these changes, however, the General Assembly has not expanded the class of policies in section 10–4–609(1)(a)—specifically "automobile" and "motor vehicle" liability

not, and do not reach the parties' arguments on this point.

policies—to which UM/UIM requirements apply. While we recognize the important policy considerations behind the UM/UIM statute, there is a limit to what was "contemplated by Colorado's [UM/UIM] legislation." *Terranova,* 800 P.2d at 61–62 (explaining that "[s]ection 10–4–609 does not require full indemnification of losses suffered at the hands of uninsured motorists under all circumstances"). The General Assembly has never redefined this class of policies to support the importation of an entirely different type of insurance policy (i.e., umbrella policies) into the UM/UIM mandate. Rather, the General Assembly's actions to increase an insured's ability to obtain greater levels of UM/UIM protection all have taken place within the framework of traditional auto insurance. The evolution of these provisions only supports our conclusion that wholly distinct classes of liability policies, such as umbrella policies, do not fall within this framework. Accordingly, we decline to read section 10–4–609(1)(a) to include umbrella policies given the legislature's unwavering reference to "automobile liability or motor vehicle liability polic[ies]" in the 46 years since the UM/UIM statute was enacted.

The insureds also urge us to adopt a broad interpretation of "automobile liability or motor vehicle liability policy" out of concern that insurers will remove many policies from the reach of the UM/UIM statute, thereby frustrating the legislative intent of ensuring that individuals can maximize their options for protecting themselves and their families. They maintain that excluding umbrella policies from the UM/UIM statute will mean that the applicability of the UM/UIM mandate will turn on the label, packaging, or characterization of the policy.

Our holding, however, is not predicated on the superficial labeling or packaging of a policy. *See, e.g.,* 4 *New Appleman on Insurance Law Library Edition* § 24.02[4] (explaining one must "analyze the policy language, rather than basing decisions on labels or headings" in determining whether a particular policy affords excess or umbrella coverage). Instead, we look to the plain language of the policy to determine whether it is fundamentally an "automobile liability or motor vehicle liability policy" within the meaning of the UM/UIM statute. An insurer could not, for example, remove an automobile liability policy from the reach of the UM/UIM statute merely by adding some coverage that is unrelated to automobiles, such as identity-theft coverage.

Finally, although we hold that the UM/UIM statute does not require insurers to offer UM/UIM coverage in connection with an umbrella policy, nothing in this opinion prohibits insurers from doing so. To date, the General Assembly has left this option to the marketplace. However, if the General Assembly wishes to include umbrella policies within the scope of section 10–4–609(1)(a), it will have to expressly state so.[8]

### III. Conclusion

We hold that an umbrella policy does not fall within the ambit of section 10–4–609(1)(a). Consequently, an insurer issuing an umbrella policy is not required to offer UM/UIM coverage as part of that policy. For the reasons discussed above, the trial court did not err in granting Allstate's C.R.C.P. 12(b)(5) motion to dismiss because the insureds could not prove any set of facts for their claim under section 10–4–609(1)(a) that the insurer was obligated to offer UM/UIM coverage for the policyholder's umbrella policy. We therefore affirm the judgment of the court of appeals.

---

8. At least one state has expressly included umbrella policies within the state's UM/UIM mandate. *See, e.g.,* N.H.Rev.Stat. Ann. § 264:15(I) (2010) ("umbrella or excess policies that provide excess limits to policies described in [the Motor Vehicle Liability Policy section] shall also provide uninsured motorist coverage equal to the limits of liability purchased, unless the named insured rejects such coverage in writing").