1
 2026 CO 40 Progressive Direct Insurance Company, Petitioner: v. Andrew Ortiz, Respondent No. 24SC440Supreme Court of Colorado, En BancJune 1, 20262
 
          The
 supreme court granted certiorari to review whether it should
 reconsider its decision in State Fann Mutual Automobile
 Insurance Co. v. Brekke, 105 P.3d 177 (Colo. 2004).
 There, the supreme court held that to provide a court with
 the information necessary to determine a uninsured motorist
 ("UM") insurer's level of participation in tort
 litigation between its insured and an uninsured motorist, a
 UM insurer must plead with particularity the legitimate
 defenses it intends to raise as soon as practicable.
 Id. at 192 &n.20,193.
 
 
          With
 one minor clarification regarding C.R.C.P. 8 and C.R.C.P.
 9(b), the supreme court declines to overrule Brekke.
 Instead, the court concludes that Brekke's
 guiding principles stand. To provide a court with the
 information needed to timely determine a UM insurer's
 appropriate level of participation in tort litigation between
 its insured and an uninsured motorist, an insurer must
 —as soon as practicable—plead its legitimate
 defenses specifically. Rule 9(b) does not apply unless a UM
 insurer asserts fraud or mistake as a legitimate defense.
 
 
          Because
 the UM insurer in this case failed to meet
 Brekke's requirements, the supreme court
 concludes that the district court did not abuse its
 discretion in barring the UM insurer from contesting
 liability in the tort litigation between its insured and an
 uninsured motorist. The district court appropriately balanced
 the interests of the parties and provided the insurer with
 the opportunity for a fair hearing on its legitimate
 defenses. Accordingly, the supreme court affirms the judgment
 of the court of appeals.
 
 3
 
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 23CA292
 
 
          
 Attorneys for Petitioner: Montgomery|Amatuzio Brendan O.
 Powers Denver, Colorado
 
 
          
 Attorneys for Respondent: Western Slope Law Nelson A. Waneka
 Glenwood Springs, Colorado Galperin and Associates Jacob
 Galperin Rebecca Bilello Denver, Colorado
 
 4
 
          
 Attorneys for Amicus Curiae Colorado Trial Lawyers
 Association: Fiedler Trial Lawyers James R. Anderson Denver,
 Colorado Ramos Law Spencer B. Aitken Centennial, Colorado
 
 
          
 JUSTICE BERKENKOTTER delivered the Opinion of the Court, in
 which CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD,
 JUSTICE GABRIEL, JUSTICE SAMOUR, and JUSTICE BLANCO joined.
 
 5
 
          
 OPINION
 
 
          
 BERKENKOTTER, JUSTICE
 
 
          ¶1
 The General Assembly enacted the uninsured motorist
 ("UM")[1] statute, section 10-4-609, C.R.S. (2025),
 to mandate uninsured and underinsured motorist coverage as
 part of automobile liability policies in Colorado, providing
 protection for insured persons who suffer bodily injury or
 death caused by uninsured or underinsured motorists. See
 id. The statute establishes minimum coverage
 requirements, defines the scope of protection, and specifies
 how coverage amounts are calculated and applied. Id.
 Its purpose is to provide a mechanism through which an
 insured motorist may "purchase insurance coverage
 against loss caused by the negligent conduct of a financially
 irresponsible motorist." Aetna Cas. &Sur. Co. v.
 McMichael, 906 P.2d 92, 98 (Colo. 1995); see also
 DeHerrera v. Sentry Ins. Co., 30 P.3d 167, 174 (Colo.
 2001).
 
 
          ¶2
 Uninsured motorist coverage
 
 
 shall be in addition to any legal liability coverage and
 shall cover the difference, if any, between the amount of the
 limits of any legal liability coverage and the amount of the
 damages sustained, excluding exemplary damages, up to the
 maximum amount of the coverage obtained pursuant to this
 section.
 
 6
 
 § 10-4-609(1)(c). This gap-filling function ensures that
 insureds receive compensation up to their policy limits when
 the at-fault party's insurance is insufficient or
 nonexistent. As a prerequisite to receiving payment from its
 UM insurer, an insured must establish the liability of the
 uninsured motorist and that the insured sustained damages.
 See Aetna, 906 P.2d at 98; see also
 DeHerrera, 30 P.3d at 174; § 10-4-609.
 
 
          ¶3
 The relationship between a UM carrier and its insured is not
 without some tension. In State Farm Mutual Automobile
 Insurance Co. v. Brekke, 105 P.3d 177, 186-93 (Colo.
 2004), we recognized that a UM insurer's participation in
 tort litigation between its insured and an uninsured motorist
 "creates a real and inherent conflict of interest."
 "The insurance provider's conflicting duty to the
 insured and its interest in defending the uninsured motorist
 creates strong tension between its legal obligations and its
 business interests." Id. at 188. Given this
 tension, we set out guiding principles: A court determining a
 UM insurer's appropriate level of participation in this
 type of litigation must "balance[] the duties of the
 insurance provider and the insured's right to an
 undiluted UM recovery against the interest of the insurance
 provider in receiving a fair hearing on its legitimate
 defenses." Id. at 191.
 
 
          ¶4
 To provide a court with the information necessary to
 determine a UM insurer's level of participation, we
 continued, an insurer must plead with
 
 7
 
 particularity the legitimate defenses it intends to raise as
 soon as practicable. Id. at 192 &n.20, 193.
 
 
          ¶5
 Progressive Direct Insurance Company
 ("Progressive") now asks us to reconsider the
 particularized pleading and timeliness requirement standard
 we adopted in Brekke. See id.[2] With one minor
 clarification regarding C.R.C.P. 8 and C.R.C.P. 9(b), we
 decline to do so. Instead, we conclude that
 Brekke's guiding principles stand. To provide a
 court with the information needed to timely determine a UM
 insurer's appropriate level of participation in tort
 litigation between its insured and an uninsured motorist, an
 insurer must—as soon as practicable—plead its
 legitimate defenses specifically. Rule 9(b) does not apply
 unless a UM insurer asserts fraud or mistake as a legitimate
 defense. Generalized, boilerplate allegations do not meet
 either standard. The resulting determination by a court is
 subject to review for an abuse of discretion.
 Brekke, 105 P.3d at 183.
 
 
          ¶6
 Progressive failed to meet Brekke's
 requirements. Consequently, we conclude that the district
 court did not abuse its discretion when it ruled that
 Progressive could not contest liability in the tort
 litigation between its insured, Andrew Ortiz
 ("Ortiz"), and the uninsured motorist, Tania
 Granados Camacho
 
 8
 
 ("Camacho"). The district court appropriately
 balanced the interests of the parties and provided
 Progressive with the opportunity for a fair hearing on its
 legitimate defenses. Accordingly, we affirm the judgment of
 the court of appeals.
 
 
          I.
 Facts and Procedural History
 
 
          ¶7
 This case arises from an accident between an uninsured
 driver, Camacho, and the insured plaintiff in this case,
 Ortiz. Camacho's and Ortiz's vehicles collided with
 one another as Ortiz attempted to turn left into a parking
 lot. At the time of the collision, Camacho was uninsured,
 driving with only a learner's permit, and unsupervised by
 an adult. Ortiz was insured by Progressive under a policy
 that included UM coverage.
 
 
          ¶8
 After the crash, Ortiz filed a claim with Progressive for UM
 benefits. Progressive denied Ortiz's claim after
 concluding that Ortiz was more than 50% at fault for the
 collision. Ortiz then filed suit against Camacho alleging
 negligence and negligence per se. He also asserted claims
 against Progressive for breach of contract, common law
 insurance bad faith, and unreasonable delay and denial of
 insurance benefits under sections 10-3-1115 to -1116, C.R.S.
 (2025).
 
 
          ¶9
 Camacho never responded to Ortiz's complaint. Ortiz filed
 a motion seeking default judgment—which the court
 interpreted as a motion for entry of a clerk's default
 against Camacho. The court granted the motion pursuant to
 C.R.C.P. 55(a) and directed the clerk to enter Camacho's
 default. Though
 
 9
 
 Progressive had been served with Ortiz's motion and the
 district court's order entering default, Progressive did
 not file a response to the motion or take any action with
 respect to the court's order.
 
 
          ¶10
 Progressive, however, did file an answer to Ortiz's
 complaint in which it (1) admitted that Camacho was partially
 at fault for the accident; and (2) responded to every one of
 Ortiz's allegations against Camacho by stating that the
 claim was "not direc[ted] to [Progressive] and therefore
 no response is required." In its affirmative defenses,
 Progressive asserted that any damages sustained by Ortiz were
 due to intervening or superseding causes or circumstances,
 and the acts or omissions of parties other than Progressive.
 It further claimed that Ortiz's right of recovery against
 it, if any, may be barred or diminished by his comparative or
 contributory fault.
 
 
          ¶11
 Later, Ortiz and Progressive submitted a joint proposed case
 management order. In his description of the case and
 identification of the issues to be tried, Ortiz asserted that
 the "issues concern liability, causation of [his]
 injuries, the extent of [his] damages, [and] the bad faith
 conduct of Progressive." In its description, Progressive
 denied Ortiz's claims against it and described the case
 as "a simple liability dispute where [Ortiz] has failed
 to support his claim that he was not the majority at fault
 for the underlying motor vehicle accident." Progressive
 
 10
 
 also listed several affirmative defenses that it intended to
 assert. It did not, however, include comparative fault in
 that list.
 
 
          ¶12
 The district court issued a case management order that
 largely accepted the language in the parties' proposed
 case management order, including their respective
 descriptions of the nature of the case, the issues to be
 tried, and Progressive's affirmative defenses.
 
 
          ¶13
 Ten months after the district court granted entry of the
 clerk's default against Camacho, Ortiz moved for partial
 summary judgment against both Camacho and Progressive. He
 argued that the undisputed facts showed that Camacho was
 "the sole proximate cause of the subject motor vehicle
 collision" and, thus, his injuries. Progressive
 responded to Ortiz's motion by asserting—for the
 first time—that it was "entitled to participate in
 the liability and damages components of the default[]
 judgment hearing." The district court denied Ortiz's
 motion as to Camacho after concluding that default judgment,
 not summary judgment, was the proper remedy given the
 procedural posture of the case vis-a-vis Camacho. The court,
 however, suggested that it would consider a motion for
 default judgment against Camacho if Ortiz filed one.
 
 
          ¶14
 The court indicated that it would allow Progressive to
 contest Ortiz's damages in a default judgment hearing,
 but that it would not allow it to contest Camacho's
 liability in such a hearing. It reasoned that the entry of
 default in favor
 
 11
 
 of Ortiz, and against Camacho, established Camacho's
 liability "for purposes of moving forward with default
 judgment." Moreover, the court emphasized, Progressive
 did not raise any objection or even concern about its
 liability issues ten months earlier when the court granted
 the entry of default.
 
 
          ¶15
 Relying on this court's guidance in Brekke, 105
 P.3d at 186-93, the district court additionally found that
 even if it was inclined to hear Progressive's liability
 challenge during a default judgment hearing, Progressive
 failed to make the required particularized showing that its
 participation in determining liability was necessary to
 ensure a fair hearing. To the contrary, the district court
 found that Progressive presented only "general,
 boilerplate affirmative defenses or statements" in its
 answer and "did not raise any objection or even concern
 about its liability issues" when default was entered.
 
 
          ¶16
 But the district court emphasized that Progressive
 could—just as Brekke contemplated—fully
 participate in the damages phase of the default judgment
 hearing where Ortiz would attempt to establish the damages he
 suffered in the crash. After that, Ortiz's claims against
 Progressive for bad faith breach and breach of contract would
 separately proceed to trial before a jury.
 
 
          ¶17
 Progressive and Ortiz subsequently participated in the
 damages phase of the default judgment hearing. Camacho did
 not participate. During the hearing,
 
 12
 
 Ortiz and his treating physician testified about causation
 and the extent of Ortiz's damages. Progressive's
 counsel cross-examined both witnesses.
 
 
          ¶18
 Thereafter, the district court concluded that Camacho's
 liability for the accident with Ortiz was established by her
 default. With respect to damages, the court awarded Ortiz
 $20,000 of the $100,000 in noneconomic and permanent physical
 impairment damages that he sought.
 
 
          ¶19
 The court entered default judgment in favor of Ortiz and
 against Camacho in the amount of $86,958.66. This consisted
 of the $20,000 award for noneconomic and permanent physical
 impairment damages, along with approximately $48,000 in
 medical expenses, and approximately $18,000 in prejudgment
 interest. Progressive then paid Ortiz this amount,
 effectively resolving his claim for breach of contract.
 
 
          ¶20
 Later, Progressive and Ortiz proceeded to trial before a jury
 on Ortiz's two remaining claims: common law and statutory
 bad faith breach of an insurance contract. Causation was the
 central theme during the trial. Progressive's argument
 was that Ortiz was primarily at fault for the crash. Its
 counsel repeatedly advanced this position during opening
 statements, throughout witness examinations, and during
 closing argument. Progressive acknowledged that Camacho was
 found liable for the crash in earlier litigation but
 emphasized that this was simply because of a "technical
 default." And Progressive explained to
 
 13
 
 the jury that it initially refused to pay Ortiz any UM
 benefits because it reasonably determined, based on its
 investigation, that Ortiz was more than 50% at fault for the
 accident.
 
 
          ¶21
 Consistent with Progressive's position, the district
 court instructed the jury that:
 
 
 • the . . . court found Camacho at fault for the
 accident by default because she "did not respond or
 contest liability";
 
 
 • Progressive "denies that it acted in bad faith or
 unreasonably delayed or denied [UM] benefits" because
 "it found through its own investigation that [Ortiz] was
 at fault for the accident, a decision it maintains was
 reasonable and a good faith basis to deny uninsured motorist
 benefits";
 
 
 • "[w]hether or not a person has a valid
 driver's license is not relevant to determining whether
 that person was driving negligently at the time of the
 accident"; and
 
 
 • at the time of the accident, several Colorado
 statutes, all of which were potentially relevant to
 determining fault for the accident, governed vehicles turning
 left, drivers passing other drivers on the right, driving on
 roadways laned for traffic, and careless driving that causes
 bodily injury.
 
 
 Ortiz v. Progressive Direct Ins. Co., 2024 COA 54,
 ¶ 15, 554 P.3d 537, 542 (alterations in original).
 
 
          ¶22
 The jury found in Ortiz's favor on both claims, awarding
 him $76,493.53 for unreasonable delay and denial of insurance
 benefits and $140,000 for common law insurance bad faith.
 Thereafter, Progressive moved the court for a new trial on
 the basis that there were "inherent and unaddressed
 inconsistencies in the [c]ourt's
 
 14
 
 [o]rders." Specifically, Progressive argued that the
 district court's summary judgment order barring it from
 contesting Camacho's liability was inconsistent with the
 pleadings and proposed case management order, which
 Progressive claimed identified comparative fault as an issue
 to be tried. The district court denied Progressive's
 motion, reasoning that the statements in the proposed case
 management order, "which were prepared by the parties
 not the [c]ourt, indicate that Progressive was contesting its
 liability on [Ortiz's] claims for breach of contract and
 bad faith claims," not "challenging or seeking to
 stand in . . . Camacho's shoes to contest liability in
 this lawsuit on [Ortiz's] negligence claim."
 
 
          ¶23
 More importantly, the district court added, Progressive's
 statement of the issues in the proposed case management order
 did not include the particularized showing required under
 Brekke, 105 P.3d at 192. Further, Progressive did
 not attempt to make the required showing until nearly a year
 after default had already been entered against Camacho.
 
 
          ¶24
 On appeal, Progressive argued that it was improperly
 restricted from participating in the tort litigation between
 Camacho and Ortiz, which prejudiced Progressive "by
 precluding any consideration of its coverage defense or
 reduction of damages based on comparative fault."
 Ortiz, ¶¶ 30-31, 554 P.3d at 544-45.
 
 
          ¶25
 The division was unpersuaded. It began its consideration of
 Progressive's argument by reviewing our holding in
 Brekke, 105 P.3d at 192 &n.20, 193: To
 
 15
 
 provide a court with the information necessary to determine a
 UM insurer's level of participation, an insurer must
 plead with particularity the legitimate defenses it intends
 to raise as soon as practicable. Ortiz, ¶ 24,
 554 P.3d at 544.
 
 
          ¶26
 Applying Brekke, the division explained that a court
 must consider, in each case, "the unique relationship
 between the insured and insurance provider and balance the
 insurance provider's duties to the insured and the
 insured's right to undiluted UM recovery against the
 interest of the insurance provider in receiving a fair
 hearing on its legitimate defenses." Ortiz,
 ¶ 35, 554 P.3d at 545 (quoting Brekke, 105 P.3d
 at 181). In this case, the division concluded "[t]he
 district court did exactly that." Id.
 
 
          ¶27
 The district court—consistent with
 Brekke—assessed the need for Progressive to
 participate in the liability determination based on the
 specific circumstances of the insurer-insured relationship
 and Progressive's insufficient pleading of its
 comparative fault defense. See Ortiz, ¶ 35, 554
 P.3d at 545. The division continued, "[T]he district
 court sought to balance the interests of the parties and
 compensate for Progressive's exclusion from the liability
 determination by permitting Progressive to participate in the
 damages hearing and proceed to trial on the claims that Ortiz
 brought against it." Id. at ¶ 35, 554 P.3d
 at 545-46.
 
 16
 
          ¶28
 During the damages phase of the default judgment hearing and
 the jury trial, Progressive was able, the division
 emphasized, to explore the respective fault of each driver
 and the cause of the accident. Id. at ¶ 36, 554
 P.3d at 546. "And its defense was partially
 successful." Id. Following the damages hearing,
 "Ortiz received just [20%] of his requested noneconomic
 damages and damages for permanent physical impairment."
 Id. Thus, the division discerned no abuse of
 discretion in the district court's decision to bar
 Progressive from contesting Camacho's liability during
 the default judgment hearing. Id. at ¶¶
 37, 51, 554 P.3d at 546, 548.
 
 
          ¶29
 In his special concurrence, Judge Lipinsky disagreed with the
 division's application of Brekke and articulated
 three reasons why its holding may lead to unjust results for
 insurance providers. Ortiz, ¶ 52, 554 P.3d at
 548 (Lipinsky, J., specially concurring).
 
 
          ¶30
 First, Progressive should have been able to litigate
 Ortiz's liability—"specifically, whether he
 was more than 50% at fault for the collision."
 Id. at ¶ 53, 554 P.3d at 548. Because
 Progressive was denied its day in court, Judge Lipinsky
 explained, "[W]e do not know whether Ortiz was entitled
 to recover UM benefits from Progressive." Id.
 at ¶ 54, 554 P.3d at 548. Second, Camacho's
 liability "should not have been binding on
 Progressive." Id. at ¶ 55, 554 P.3d at
 548. Thus, in Judge Lipinsky's view, the district court
 should've allowed Progressive to
 
 17
 
 litigate Ortiz's fault (1) before it entered the Rule
 55(a) default, and (2) "despite the entry of" the
 default. Id. Third, footnote twenty in
 Brekke "can lead to unjust outcomes in UM
 coverage cases by resolving [an insured's] coverage
 claims based on a formalistic requirement that the supreme
 court appears to have invented." Ortiz, ¶
 56, 554 P.3d at 548 (Lipinsky, J., specially concurring).
 
 
          ¶31
 Judge Lipinsky accordingly urged this court "to
 reconsider Brekke's restrictions on an
 insurer's ability to defend itself against its
 policyholder's coverage claims in UM litigation."
 Ortiz, ¶ 122, 554 P.3d at 557.
 
 
          ¶32
 Progressive now appeals the division's decision and,
 echoing the concurrence, asks this court to reconsider
 Brekke's particularity and timeliness
 requirements.
 
 
          II.
 Analysis
 
 
          ¶33
 We begin our analysis by setting out the standard of review.
 We then briefly describe UM coverage before explaining our
 decision in Brekke, the quasi-fiduciary relationship
 caused by the special nature of UM coverage, and the steps a
 court must take to determine the appropriate level of
 participation by an insurer in tort litigation between its
 insured and an uninsured motorist. Finally, after pausing to
 discuss stare decisis, we analyze whether to reconsider our
 holding in Brekke.
 
 18
 
          A.
 Standard of Review
 
 
          ¶34
 Progressive asks us to: (1) reconsider the Brekke
 particularity and timeliness requirements, and (2) reverse
 the division's conclusion that the district court did not
 abuse its discretion in prohibiting Progressive from
 contesting Camacho's liability during the default
 judgment hearing, Ortiz, ¶¶ 37, 51, 554
 P.3d at 546, 548. As such, we review this case de novo.
 See Gallegos v. Colo. Ground Water Comm'n, 147
 P.3d 20, 28 (Colo. 2006) ("We review the district
 court's . . . application of . . . case law de
 novo."); see also In re Marriage of Durie, 2020
 CO 7, ¶ 13, 456 P.3d 463, 468.
 
 
          B.
 UM Coverage
 
 
          ¶35
 The UM statute requires auto insurance policies to offer
 optional UM coverage. § 10-4-609(1)(a)(I). This
 coverage, as the name suggests, provides benefits when a
 tortfeasor lacks liability insurance or is underinsured.
 See DeHerrera, 30 P.3d at 173-74. Specifically, a UM
 policy "is first-party coverage," which
 "allows an insured to collect payment from [their] own
 insurer for injury suffered as a result of the actions of an
 at-fault uninsured or underinsured driver." Apodaca
 v. Allstate Ins. Co., 255 P.3d 1099, 1103 (Colo. 2011).
 
 
          ¶36
 An insured must establish that they are "'legally
 entitled to recover damages[;]'" that is, "that
 the fault of the uninsured [or underinsured] motorist gave
 rise to damages and the extent of those damages."
 Borjas v. State Farm Mut. Auto. Ins. Co.,
 
 19
 
 33 P.3d 1265, 1269 (Colo.App. 2001) (quoting §
 10-4-609(1)(a)(I)). "Once the insured meets this burden,
 the insurer is under a contractual and statutory duty to
 compensate the insured." Peterman v. State Farm Mut.
 Auto. Ins. Co., 961 P.2d 487, 493 (Colo. 1998).
 
 
          C.
 Brekke
 
 
          ¶37
 In Brekke, we addressed the disparity in power and
 resources between a UM insurer and its insured when an
 insurer wants to participate in tort litigation between its
 insured and an uninsured motorist. 105 P.3d at 187-88. As
 noted, UM coverage only applies "if the insured is
 'legally entitled' to damages." Id. at
 188 (quoting § 10-4-609(1)(a)(I)). And, because "a
 finding of no liability or of limited damages on the part of
 the uninsured motorist will eliminate or limit a claim under
 the insurance provider's UM coverage[,] . . . it is to
 the insurance provider's advantage to advocate the
 interests of the uninsured motorist in the tort
 litigation." Id. Even so, while an insurer has
 an interest in participating in the tort litigation, its
 insured's UM coverage may not be diluted. See
 id. at 190.
 
 
          ¶38
 Thus, as we explained in Brekke, an insurer's
 participation in tort litigation between its insured and an
 uninsured motorist "creates a real and inherent conflict
 of interest." Id. at 187. Specifically,
 "[t]he insurance provider's conflicting duty to the
 insured and its interest in defending the uninsured motorist
 creates strong tension between its legal obligations and its
 business interests." Id. at 188.
 
 20
 
          ¶39
 Accordingly, in Brekke, we emphasized that when a UM
 insurer seeks to participate in litigation between its
 insured and an uninsured motorist, the court must determine
 the insurer's appropriate level of participation in such
 litigation. See id. at 183. To do so, a court must
 balance "the duties of the insurance provider and the
 insured's right to an undiluted UM recovery against the
 interest of the insurance provider in receiving a fair
 hearing on its legitimate defenses." Id. at
 191. And, given the imbalance of power and resources between
 an insured and insurer, "the burden falls on the
 insurance provider to show that its interest in a fair
 hearing on its legitimate defenses will be unprotected
 without greater participation in the proceedings."
 Id. at 192. Thus, we concluded in Brekke
 that an insurer must plead with particularity the legitimate
 defenses it intends to raise as soon as practicable so a
 court would have the information necessary to determine a UM
 insurer's appropriate level of participation.
 Id. at 192 &n.20, 193.
 
 
          D.
 Stare Decisis
 
 
          ¶40
 Progressive's request for us to review our prior holding
 in Brekke triggers principles of stare decisis.
 
 
          ¶41
 "Stare decisis is a judge-made doctrine that promotes
 uniformity, certainty, and stability of the law."
 People v. LaRosa, 2013 CO 2, ¶ 28, 293 P.3d
 567, 574. While "[t]he principles of stare decisis
 provide that this Court will follow the rule of law it has
 established in earlier cases[,]" Bedor v.
 Johnson, 2013 CO 4, ¶ 23, 292 P.3d 924, 929,
 
 21
 
 "[we] are not without power to depart from a prior
 ruling, or to overrule it, where sound reasons exist[,]"
 Creacy v. Indus. Comm'n, 366 P.2d 384, 386
 (Colo. 1961); see also People v. Porter, 2015 CO 34,
 ¶ 23, 348 P.3d 922, 927 ("[Stare decisis] is not so
 rigid as to prevent us from reevaluating our
 precedent.").
 
 
          ¶42
 However, "[w]e will depart from our existing law only if
 we are clearly convinced that (1) the rule was originally
 erroneous or is no longer sound because of changing
 conditions[,] and (2) more good than harm will come from
 departing from precedent." Love v. Klosky, 2018
 CO 20, ¶ 15, 413 P.3d 1267, 1270.
 
 
          ¶43
 With these principles in mind, we turn to the issue before us
 to determine whether it is appropriate to depart from our
 precedent in Brekke. For the reasons explained
 below, we conclude it is not. While we clarify our holding in
 Brekke, the case remains good law.
 
 
          E.
 No Sound Reason Exists to Depart from Our Holding in
 Brekke
 
 
          ¶44
 Progressive asks this court to reconsider the particularized
 pleading and timeliness standards we articulated in
 Brekke. It contends that Brekke represents
 a radical change in the rules of civil procedure, including
 Rule 8 (governing the pleading of basic affirmative defenses
 like comparative negligence) and Rule 9 (outlining the
 requirements for pleading certain claims, including fraud,
 with particularity). It asserts that this court may not
 modify Rule 8 or extend Rule 9 through Brekke
 because such a radical change should proceed through the
 
 22
 
 established protocol of the Civil Rules Committee rather than
 by way of a footnote in an opinion.
 
 
          ¶45
 Progressive additionally argues that Brekke's
 holding is contrary to the public policy declarations in
 Colorado's statutes governing comparative negligence,
 § 13-21-111, C.R.S. (2025), and UM coverage, §
 10-4-609. In its view, this change is not necessary to
 balance the interests of the insured and insurer nor to
 "assur[e] timely notice to the insured of the UM
 insurer's legitimate defenses." Finally, it contends
 that the division should have reversed the district
 court's decision to apply Brekke's
 heightened standards and bar Progressive from presenting its
 comparative negligence defense during the default judgment
 hearing. It asks that we reconsider Brekke and
 remand this case for a jury trial on Camacho's liability.
 Save for one point of clarification, we disagree.
 
 
          ¶46
 We are unpersuaded by Progressive's arguments. Our
 holding in Brekke wasn't intended to amend the
 rules of civil procedure. Rather, the pleading requirements
 we established there apply to a very narrow universe of
 cases. Specifically, the requirements are intended to provide
 a court with the information it needs to determine
 the scope of an insurer's participation in tort
 litigation between its insured and an uninsured motorist. To
 analyze the competing interests in this circumstance and
 decide how the tort litigation should move
 
 23
 
 forward, a court must know what legitimate defenses a UM
 insurer plans to pursue. And it needs this information as
 soon as practicable.
 
 
          ¶47
 Progressive's contention with respect to Rule 9(b) is
 somewhat more availing. Rule 9(b) provides: "In all
 averments of fraud or mistake, the circumstances constituting
 fraud or mistake shall be stated with particularity."
 C.R.C.P. 9(b). To the extent that footnote twenty in
 Brekke may be read to suggest that the
 particularized pleading standard set forth in Rule 9(b)
 always applies in this situation, we clarify that it does
 not. Rule 9(b) does not apply unless a UM insurer asserts
 fraud or mistake as a legitimate defense. In sum,
 Brekke is best understood as requiring a UM insurer
 to plead its legitimate defenses specifically unless fraud or
 mistake are asserted as legitimate defenses. Generalized,
 boilerplate defenses are insufficient to meet either
 standard.
 
 
          ¶48
 That clarification aside, we perceive no reason to overrule
 or otherwise limit our holding in Brekke. See
 Love, ¶ 15, 413 P.3d at 1270 (holding that courts
 will not depart from prior rulings if there is no sound
 reason to do so). We are unconvinced by Progressive's
 remaining public policy argument, which we considered and
 rejected in Brekke. Progressive argues that
 Brekke's pleading and timeliness standards
 create an unnecessary risk that insureds, whose negligence is
 50% or more, can receive UM benefits contrary to public
 policy. See § 13-21-111. However,
 Brekke's holding recognizes that risk as well as
 UM insurers' conflict of
 
 24
 
 interest—when participating in tort litigation between
 its insured and an uninsured motorist—and appropriately
 balances the interests of UM insurers and their insureds in
 such litigation. See, e.g., 105 P.3d at 181, 183,
 186, 189-90, 192.
 
 
          ¶49
 Insurers will be permitted to participate in tort litigation
 between the insured and uninsured motorist "only when it
 clearly appears that the legitimate defenses of the insurance
 provider will not be presented to the court without
 such" participation. Id. at 193. Accordingly, a
 "court must determine the extent of participation by an
 insurance provider in the tort litigation on a case-by-case
 basis, subject to review for abuse of discretion."
 Id. at 183.
 
 
          ¶50
 The district court proceeded exactly as Brekke
 requires. Upon learning for the first time that Progressive
 wished to participate in the proceeding between Ortiz and
 Camacho—ten months after the district court's entry
 of the clerk's default against Camacho and the completion
 of discovery—the court applied Brekke's
 requirements to assess the timing and particularity of
 Progressive's pleadings. In doing so, the court addressed
 three issues. First, the court considered the effect of the
 entry of default. It concluded that Camacho's liability
 was established when default was entered in April of 2021 and
 "Progressive did not raise any objection or even concern
 about its liability issues at that time."
 
 25
 
 Second, the court considered whether Progressive had met the
 necessary showing as soon as practicable as required under
 Brekke.[3] It concluded that
 
 
 even if the [c]ourt were inclined to hear such a challenge,
 the [c]ourt finds that . . . Progressive has not met its
 burden to show that its participation in a default judgment
 hearing on the issue of liability is required to ensure a
 fair hearing.... Progressive has not made the particularized
 showing required under Brekke in its [a]nswer or
 [r]esponse to the [m]otion [for summary judgment]. Moreover,
 the arguments made in the [r]esponse to the [m]otion about
 comparative/contributory fault between [Ortiz] and . . .
 Camacho could have been made at the outset of the
 case—namely in the [a]nswer or in response to
 [Ortiz's] motion for entry of default—and were not
 raised. Brekke requires more than general,
 boilerplate affirmative defenses or statements. And, raising
 these issues now does not meet Brekke's "as
 soon as practicable" mandate.
 
 
 (Citation omitted.)
 
 
          ¶51
 And third, the district court examined whether Progressive
 met its burden to show that its interest in a fair hearing on
 its legitimate defenses would be unprotected without greater
 participation in the proceedings. As to this issue, the court
 concluded that Progressive could "fully participate in
 any default judgment damages hearing." During this
 hearing and the trial between Progressive and Ortiz,
 "Progressive explored the cause of the accident and the
 respective fault of"
 
 26
 
 Ortiz and Camacho. At trial, the court instructed the jury
 regarding the default judgment, explaining that the court
 found Camacho at fault for the accident by default because
 she "did not respond or contest liability." It
 further explained in the instructions that Progressive
 "denies that it acted in bad faith or unreasonably
 delayed or denied [UM] benefits" because "it found
 through its own investigation that [Ortiz] was at fault for
 the accident, a decision it maintains was reasonable and a
 good faith basis to deny uninsured motorist benefits."
 
 
          ¶52
 And Progressive's "defense was partially successful.
 Due to Progressive's cross-examination during the damages
 hearing of Ortiz and his treating physician about causation
 and the extent of Ortiz's damages, Ortiz received just
 [20%] of his requested noneconomic damages and damages for
 permanent physical impairment." Ortiz, ¶
 36, 554 P.3d at 546. Accordingly, we agree with the division:
 Progressive's argument "that the district court
 precluded 'any consideration of its coverage defense or
 reduction of damages based on comparative fault' is thus
 without merit." Id.
 
 
          ¶53
 In this case, Progressive failed to specifically plead the
 legitimate defenses it intended to raise as soon as
 practicable. See id. at ¶¶ 35-37, 554 P.3d
 at 545-46; see also Brekke, 105 P.3d at 192.
 Progressive waited until ten months after the court granted
 entry of the clerk's default and the close of discovery
 to mention its interest in participating in the proceedings
 between Ortiz and Camacho. And, as
 
 27
 
 explained above, Progressive's briefing in its answer and
 response to Ortiz's motion for summary judgment lacked
 specificity and contained general, boilerplate affirmative
 defenses and statements insufficient to satisfy
 Brekke's requirements. Accordingly, the division
 properly affirmed the district court's conclusion
 
 
 that Progressive's failure to respond to Ortiz's
 allegations against Camacho (by asserting in its answer that
 those allegations were directed only to Camacho), its general
 denials of responsibility, its vague assertion that
 comparative fault may play an unspecified role in the
 litigation, and its failure to adequately raise the issue of
 comparative fault until nearly a year after default was
 entered against Camacho were insufficient for Progressive to
 show the necessity of its participation in the liability
 determination.
 
 
 Ortiz, ¶ 33, 554 P.3d at 545.
 
 
          III.
 Conclusion
 
 
          ¶54
 Our decision in Brekke announces specific notice and
 timing requirements for a UM insurer that seeks to
 participate in tort litigation between its insured and an
 uninsured motorist: To provide a court with the information
 necessary to determine a UM insurer's appropriate level
 of participation, an insurer must—as soon as
 practicable—plead its legitimate defenses specifically.
 Pleading with particularity as required by Rule 9(b) is not
 required unless a UM insurer asserts fraud or mistake as a
 legitimate defense. Generalized, boilerplate allegations do
 not meet either standard. Brekke, 105 P.3d at
 192-93.
 
 28
 
          ¶55
 While we clarify footnote twenty, Brekke remains
 good law in all other respects. UM coverage provides
 important protections to insureds, which may not be diluted
 by insurers. And while UM insurers also have a legitimate
 stake in tort litigation between their insureds and uninsured
 motorists, their participation in such litigation has
 prerequisites.
 
 
          ¶56
 Accordingly, we affirm the division's judgment and remand
 the case to the division with instructions to return it to
 the district court to determine and award the amount of
 appellate attorney fees and costs incurred by Ortiz on
 appeal.
 
 
 ---------
 
 
 Notes:
 
 
 [1] Significantly, UM coverage extends
 beyond traditional uninsured vehicles to include underinsured
 motorist ("UIM") protection. § 10-4-609,
 C.R.S. (2025). This case involves only UM coverage, though
 our holding here extends to UIM coverage as well.
 
 
 [2] We granted certiorari to review the
 following issue:
 
 
 Whether the court should reconsider the . . .
 Brekke . . . standard related to the particularized
 pleading and timeliness requirements imposed on insurers in
 UM litigation.
 
 
 [3] The district court considered whether
 Progressive made a "particularized
 showing." It appears nonetheless to have analyzed
 whether Progressive set forth its legitimate defenses
 specifically, rather than whether Progressive met Rule
 9(b)'s particularized pleading standard. But even if the
 court had applied Rule 9(b), it still reached the correct
 conclusion as Progressive's arguments were not made
 "as soon as practicable." Brekke, 105 P.3d
 at 192.
 
 
 ---------